In re SABRINA M., Dawn-Marie M., and Daniel R.

Supreme Judicial Court of Maine.

Argued Sept. 24, 1982.

Decided May 18, 1983.

Stanley Greenberg, (orally), Portland, for plaintiff.

Peter J. Goranites (orally), Portland, for Sabrina and Dawn-Marie R.

Peter J. Landis (orally), Portland, for Daniel R.

Thomas E. Geyer, Asst. Atty. Gen. (orally), Augusta, for Dept. of Human Services.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

Appellant, the mother of Sabrina, Dawn-Marie and Daniel, appeals from a judgment of the Superior Court, Cumberland County, affirming two orders of the District Court [1] that granted custody of her children to the Maine Department of Human Services (DHS) pursuant to 22 M.R.S.A. §§ 4035, 4036 (Supp.1982).[2] On appeal, she contends: (1) the record does not support the trial court's determination that the children were in circumstances of jeopardy to their health and welfare; and (2) the statutory standard of proof "by a preponderance of evidence"[3] deprived her of due process. She also raises several issues concerning the method by which the trial court set forth its findings of fact. We deny the appeal and affirm the judgment.

Sabrina, Dawn-Marie and Daniel are now twelve, eleven and seven years old respectively. Sometime in late June or early July of 1980, the DHS received information that Sabrina and Dawn-Marie had been sexually abused. On July 11, 1980, two social workers of the DHS went to appellant's apartment to discuss this matter with her. At this time, appellant expressed concern about the possible detrimental effect the sexual abuse would have on her female children. On July 18, 1980, appellant voluntarily placed all three children with the DHS. On August 4, 1980, after confirming that the two girls had been subject to a history of sexual abuse while in appellant's custody and an incident of physical abuse by a male acquaintance of appellant against Daniel, DHS filed two petitions for protective custody of the children pursuant to the "Child and Family Services and Child Protection Act" (the "Act"), 22 M.R.S.A. §§ 4001–4071 (Supp.1982). The petitions alleged that, if the children were returned to their mother, Sabrina and Dawn-Marie would be subject to physical abuse, sexual abuse and emotional jeopardy, and Danny would be subject to physical abuse. The District Court issued an ex parte order granting temporary custody of the children to the DHS on August 4, 1980. Then, on August 21, 1980, the District Court issued a preliminary protection order pursuant to 22 M.R.S.A. § 4034, granting DHS custody of the children pending further order of the Court.

The hearing on both petitions was held on October 27, 1980, November 14, 1980, and January 6, 1981. A review of the record of the hearing discloses the following evidence. Elizabeth Buxton, a social worker employed by the DHS, testified that she had numerous contacts with appellant and her children dating back to 1976. Sometime in early July of 1980, the Department received information that the girls had been sexually abused. On July 11, 1980, she went to appellant's apartment with a protective worker to talk to appellant about this mat-

---

1. The DHS filed one petition for protective custody of Sabrina and Dawn-Marie, and it filed another petition for protective custody of Daniel. The District Court entered separate orders on each petition.

2. 22 M.R.S.A. § 4035(3) provides in relevant part: "If the court determines that the child is in circumstances of jeopardy to his health or welfare ... [t]he court may then make an order of any disposition under section 4036."

Section 4036(1)(F) provides in relevant part: "In a protection order, the court may order ... [r]emoval of the child from his custodian and granting custody to ... the department."

3. 22 M.R.S.A. § 4035(2) provides: "After hearing evidence, the court shall make a finding, by a preponderance of the evidence, whether the child is in circumstances of jeopardy to his health or welfare."

ter. She testified that appellant expressed concern how her children would handle the sexual abuse. Appellant further told her that sometime about one and a half or two years earlier, Dawn-Marie was sexually molested by a friend of her ex-husband. After appellant had voluntarily placed the children with the DHS, Ms. Buxton was present while Sabrina was being interviewed by a Youth Aid Police Officer regarding incidents of sexual abuse. At the interview, Sabrina gave a detailed description of a sexual molestation committed by John B., who had been staying at appellant's home and was a friend of her boy friend, Tom D. About one week later, she spoke with both Dawn-Marie and Sabrina. Sabrina then told her that Mr. D. had also sexually molested her. Dawn-Marie corroborated Sabrina's story and also told Ms. Buxton that she had been molested by Mr. B., but not Mr. D. She testified that the DHS brought the petition for temporary custody because of the concerns of sexual jeopardy to the girls and their concern that Danny would be harmed because he had once sustained an injury from Mr. D. She opined that the mother was unable to provide the necessary supervision to prevent these incidents from reoccurring. She also testified that she was aware that Danny suffered behavioral problems.

Charles Dietzel, a child protective worker, became involved about the time the appellant entered into the contract for voluntary placement in July 1980. He testified to the following. Appellant voluntarily placed the children with the DHS because she was too emotionally upset to take care of the children and her fear that Mr. B. would do something to them in retaliation for pressing criminal charges against him. He, Dietzel, was present during Dawn-Marie's interview with the Youth Aid Police Officer at the police station. At that time, Dawn-Marie said she had been sexually molested by Mr. B. He filed the petition on August 4, 1980, due to the concern that the girls would potentially be subject to further sexual abuse if they returned to their mother's custody and because a psychological evalua-

tion showed that all the children suffered severe emotional dysfunction. According to Mr. Dietzel, the DHS pursued the petition not only because the environment she provided would potentially jeopardize the children, but because the appellant needed therapeutic intervention to understand the needs of the children. It was his opinion that, based on past experience, she would not seek help if they did not intervene.

Dr. Glen R. Robinson, a psychologist, testified that he evaluated all three children in late July or early August of 1980 pursuant to a request by Charles Dietzel. Based on his evaluation, he stated that Daniel displayed an unusual amount of rage. He recommended that Daniel be placed with the State because of his excessive disruptive behavior which included occasional fire-setting, and violent, assaultive behavior to other children. Furthermore, he concluded that all three children exhibit assaultive behavior. Sabrina and Daniel, however, were more assaultive than Dawn-Marie. Sabrina had displayed severe assaultive behavior against Daniel and she was overly aggressive with the neighborhood children. He further stated that she physically assaulted people with a destructiveness. Besides the assaultive behavior, he recommended that the girls be placed with the State because they both exhibit an inappropriate "seduction-like" behavior. He was concerned that this behavior could invite sexual overtures from men who were confused about their own impulse controls. He characterized their behavior as transcending the normal limits of tactile behavior. In conclusion, he opined that returning the children to the environment presently provided by their mother would jeopardize their health and welfare because they would be subject to severe anxiety, some depression, dysfunctional behavior and the potential for sexual abuse.

Mrs. Frances Cole, a licensed foster mother, testified as follows. The children had been living with her family since July of 1980. When the children first came to live with them, they were hostile and belliger-

ent. One time, Daniel ripped an earring out of a little girl's ear, tearing her ear lobe, and he was otherwise generally assaultive. The behavior of all the children has subsequently changed in that they seem to cope better. Daniel in particular did not seem as assaultive as he was at first. He still gets into fights with other children, but he no longer wants to kill them.

Appellant presented two witnesses who testified that she appeared to be a good mother and that she provided for her children. Appellant testified that she placed the children with the DHS when she went into the hospital to avert a nervous breakdown. She was unaware of the incidents of sexual abuse until Ms. Buxton came to speak to her in July of 1980. Furthermore, she was unaware of anything that Sabrina or Dawn-Marie did to prompt the abuse. She denied that the children had behavioral problems except for occasional bedwetting. Finally, she testified she is presently undergoing counseling and she is gaining insight into the problems she has had raising the children.

Finding by a preponderance of the evidence that the children were in circumstances of jeopardy to their health and welfare, the District Court issued orders granting DHS custody of all three children on February 2, 1981. Appellant subsequently moved for findings of fact and conclusions of law pursuant to M.D.C.Civ.R. 52. The Court took no action until the parties submitted proposed findings. Over seven months later, appellant submitted her proposed findings. DHS filed its proposed findings nineteen days later on October 14, 1981. The guardian ad litem for Daniel and the guardian ad litem for Sabrina and Dawn-Marie subsequently filed their proposed findings. The Court acted on the parties' proposed findings in turn as it received them. It accepted in full the proposed findings submitted by the DHS and

both guardians. On the other hand, it designated appellant's proposed findings as either true or false. Appellant further moved for a clarification of the Court's findings. The Court responded by explaining why it designated certain of appellant's proposed findings false. The Court never reduced its findings to one document. Rather, the findings remained scattered among several documents.

On November 16, 1981, appellant appealed to the Superior Court. The Superior Court affirmed the District Court judgment ruling that: (1) the trial court's findings clearly set forth the bases for its decision; (2) the record supported the finding that the children were in circumstances of jeopardy to their health and welfare; and (3) the statutory standard of proof did not deprive appellant of due process. Appellant then appealed to this Court. Contrary to appellant's contention, the judgment is final and properly before us for review.

### I.

Appellant raises several issues concerning the method by which the District Court set forth its findings. Only the following two issues merit discussion: (1) whether the trial court erred by adopting verbatim the findings proposed by all three appellees and by designating as true or false the findings proposed by appellant; and (2) whether the court erred by setting forth its findings by referring to several documents. Appellant essentially claims that the findings are ambiguous as a result of this method and, therefore, this Court should remand the case to the trial court for clarification.

 We disagree and find no error in the instant case. It is not automatic error for the trial court to adopt verbatim the findings proposed by counsel[4] or to make its finding by referring to several docu-

---

4. *See Ramey Construction Co. v. The Apache Tribe of the Mescalero Reservation*, 616 F.2d 464, 467 (10th Cir.1980); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.

1980); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2578, 704–08 (1971).

ments.[5] We, however, agree with the other courts which have addressed similar issues that we must closely scrutinize such findings to determine whether the trial court has adequately performed its judicial function. *See Ramey Construction Co. v. The Apache Tribe of the Mescalero Reservation,* 616 F.2d 464, 467 (10th Cir.1980); *Photo Electronics Corp. v. England,* 581 F.2d 772, 777 (9th Cir.1978); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977); *In re Las Colinas, Inc.,* 426 F.2d 1005, 1010 (1st Cir.1970). In reviewing whether the trial court performed its judicial function, we must determine whether the findings adequately indicate the factual basis of the ultimate conclusion. *See Ramey Construction Co.,* 616 F.2d at 467. In the instant case, the Court's findings detailed the underlying facts upon which its decision was based. Although slight ambiguities exist in the findings, the findings essential to the ultimate conclusion are clearly set forth. Where, as in the instant case, the Court's findings are sufficiently explicit to give us an understanding of the basis of its decision, then the findings, even if set forth in several documents, meet the requirements of M.D.C.Civ.R. 52(a).

■ Although we find no error in the instant case, we do not recommend the practice utilized by the trial court. Rule 52(a) requires the trial court, upon request by a party or on its own motion, to "find the facts specially and state separately its conclusions of law" so as to fully inform the parties and the appellate court of the basis for its decision.[6] We have serious doubts that the underlying purposes of the rule can be fulfilled in the majority of cases where a trial court makes its findings in the manner employed by the District Court in the instant case.

We do not mean to suggest that the trial court should not ask counsel for both sides to submit proposed findings of fact and conclusions of law, nor do we mean to dissuade counsel from doing so on their own

accord. We are aware of the problems caused by crowded trial dockets and the submission of proposed findings can play a significant role in maximizing the use of judicial time. Proposed findings can benefit the trial court by illuminating the essential factual and legal issues and by aiding the court in drafting its own findings. *See Smith v. Young Women's Christian Association,* 438 A.2d 1276, 1278 (Me.1982); *Leo v. American Hoist & Derrick Co.,* 438 A.2d 917, 926 (Me.1981). "[S]ubmission of proposed findings helps in developing the decisional framework." *Ramey Construction Co.,* 616 F.2d at 468.

Problems may arise when the trial court adopts proposed findings verbatim without changing them to reflect its own opinion and reasoning. Very often proposed findings tend to be argumentative because counsel have been deeply involved in presenting their theory of the case and counsel are unlikely to have the ability to objectively view the evidence or the legal theories. In those circumstances, the trial court may be inviting error by adopting such findings verbatim because they may inadequately support the decision or there may exist many detailed findings which are unnecessary or lack support in the record. *See Roberts v. Ross,* 344 F.2d 747, 752 (3rd Cir.1965). Although we find no error here, we stress that the prudent procedure in circumstances such as these is to independently set forth the findings in one document. By doing so, the trial court can assure that the findings clearly set forth the reasons for its decision and this will also assure that the trial court devotes proper consideration to its judicial factfinding role.

## II.

The Act authorizes the District Court to remove children from a custodial parent and to grant custody of the children to the DHS if it finds that the children are in circumstances of jeopardy to their health or welfare. 22 M.R.S.A. §§ 4035(3),

---

**5.** *See McCune v. F. Alioto Fish Co.,* 597 F.2d 1244, 1249 (9th Cir.1979).

**6.** 1 Field, McKusick & Wroth, *Maine Civil Practice* § 52.1 at 684 (2d ed. 1970).

4036(1)(F). As relevant here, the Act defines "[j]eopardy to health or welfare" as "serious abuse or neglect, as evidenced by [s]erious harm or threat of serious harm . . . or [t]he end of voluntary placement, when the imminent return of the child to his custodian causes a threat of serious harm." 22 M.R.S.A. § 4002(6)(A), (D). Subsection 10 of 22 M.R.S.A. § 4002 defines "[s]erious harm" as:

A. Serious injury;

B. Serious mental injury or impairment, evidenced by severe anxiety, depression or withdrawal, untoward agressive behavior or similar serious dysfunctional behavior; or

C. Sexual abuse or exploitation.

■ Appellant contends that the District Court erred by concluding that the children would be in "circumstances of jeopardy to their health and welfare", because numerous findings by the Court are clearly erroneous and the remaining findings are inadequate to justify granting custody of the children to the DHS pursuant to the Act. We initially reject appellant's contention that many of the trial court's findings are clearly erroneous. Almost all the challenged findings are supported by competent evidence and, therefore, not clearly erroneous. *Harmon v. Emerson,* 425 A.2d 978, 982 (Me.1981). The few findings which are clearly erroneous are just not essential to the trial court's decision. The District Court's decision is essentially based on the following findings which are supported by competent evidence: (1) the girls had been subject to a history of sexual abuse while in their mother's custody; (2) all three children exhibit disruptive or unusual behavior; (3) both girls exhibit inappropriate "seductive-like" behavior; (4) all three children

exhibit assaultive behavior; (5) Daniel's behavior "included fire-setting, violence . . . and talk of rape and murder"; and (6) his assaultive behavior possibly presents a danger to others.

Although appellant admits that the record supports the findings that the girls were subject to sexual abuse and that all three children exhibit abnormal behavior, she contends that the trial court's findings were inadequate because: (1) there were no findings concerning the details and time of the sexual abuse; (2) the findings concerning the children's behavior did not meet the statutory criteria; and (3) there were no findings that she was unfit.[7] We disagree and conclude that the trial court's findings adequately support its decision to remove the children from the custody of their mother and to grant custody to DHS pursuant to the Act.

Appellant correctly claims that the trial court did not specifically make findings detailing the incidents of sexual abuse or the times when they occurred. That, however, does not alter our conclusion that the findings were adequate. Reading the findings as a whole, it is clear that the details and timing of the incidents of sexual abuse are not as important in this case as the fact that the incidents occurred. The trial court found that the history of sexual abuse was related to the girls' inappropriate "seductive-like" behavior. It further found that its ultimate finding is based upon episodes which were under appellant's control. This finding does not mean that she was personally culpable for the incidents, but rather the environment she provided enhanced the possibility that these incidents would occur. Therefore, by concluding that the girls

---

7. It is unclear whether appellant claims that the trial court erred by failing to make a finding that she was unfit or whether she contends that the evidence would not support such a finding. She claims that her due process rights would be violated if the DHS was granted custody without such a finding. The statute requires the District Court to find that a child is in circumstances of jeopardy to his health or welfare before it can grant custody of the child to

the DHS. The trial court's findings indicate that the appellant presently provides a home environment that jeopardizes the health and welfare of the children. Such findings imply that she is presently unfit. Furthermore, there was competent evidence to support the conclusion that she presently provided an environment jeopardous to the children. Accordingly, appellant takes nothing by this contention.

would be in circumstances of jeopardy to their health or welfare if returned to their mother, the Court must have found that the girls would potentially be subject to further sexual abuse because of their inappropriate behavior in conjunction with the environment presently provided by the mother. Competent evidence of record supports this finding. Dr. Glenn Robinson, a psychologist, testified that the sexual abuse was related to the girls' inappropriate behavior and that they would potentially be subject to sexual abuse if returned to the environment provided by their mother.

 There is no merit to appellant's contention that the Court's findings with respect to the children's mental impairment failed to meet the statutory criteria. The Court found that all three children exhibit assaultive behavior. In particular, the findings with respect to Danny show that his assaultive behavior was a serious problem. The Act provides that serious mental impairment can be evidenced by untoward aggressive behavior. 22 M.R.S.A. § 4002(10)(B). The finding that the children exhibit assaultive behavior connotes that the children exhibit violent personalities. Such a finding certainly meets the statutory standard of "untoward aggressiveness". As noted previously, the evidence supports a finding that all three children exhibit assaultive behavior, especially Sabrina and Daniel. Accordingly, we conclude that the trial justice did not erroneously conclude that the children's health or

welfare would be jeopardized if they were returned to their mother.

## III.

 Citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), appellant contends that the standard of proof "by a preponderance of the evidence" provided by 22 M.R.S.A. § 4035(2) deprived her of due process at the child protection adjudication. In *Santosky*, the United States Supreme Court held that due process requires a state to prove by at least "clear and convincing" evidence the requisite statutory criteria to terminate the rights of parents in their natural child. As an initial matter, *Santosky* does not control the instant case because, unlike *Santosky*, the deprivation of rights in the child protection adjudication involved here is neither final nor irrevocable.[8] As *Santosky* pointed out, "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Santosky*, 455 U.S. at 758, 102 S.Ct. at 1397. We, therefore, reject appellant's contention that proof "by a preponderance of the evidence" violated her due process rights in the instant proceeding because: (1) the deprivation of her rights is neither final nor irrevocable; and (2) the nature of the interests concerned in a child protection

**8.** A child protection proceeding pursuant to 22 M.R.S.A. §§ 4031–4041, at most, temporarily removes custody of the children from a parent. Even if the court finds that a child is in jeopardy to its health or welfare, it is not required to remove custody from the parent. 22 M.R.S.A. § 4036(1)(A), (B). If the court does remove the child from the custody of his parents pursuant to section 4036(1)(F), the court must review the case within 18 months of the original order, 22 M.R.S.A. § 4038(1), or the parents can move for review if their rights have not been terminated, 22 M.R.S.A. § 4038(2). Under section 4038(4), the court may hear evidence and make any new dispositional order, including returning the child to the parents pursuant to section 4036. Furthermore, where a child is ordered into the custody of the DHS, it is re-

quired to "arrange or coordinate services to facilitate the rehabilitation and reunification of the parents and child." 22 M.R.S.A. § 4041(1). Parental rights can be terminated only in a proceeding brought pursuant to 22 M.R.S.A. §§ 4051–4057 or "as part of an adoption proceeding as provided in Title 19, chapter 9, when a child protective proceeding has not been initiated." 19 M.R.S.A. § 4051. Such a petition cannot be brought "earlier than 3 months after disposition under section 4036 or under Title 19, section 752." 22 M.R.S.A. § 4052(2). The statute does require that the petitioner prove by "clear and convincing evidence" the statutory criteria required to terminate parental rights in their natural child. 22 M.R.S.A. § 4055(1)(B)(2).

proceeding significantly differs from that in a proceeding to terminate parental rights.

█ In determining what standard of proof satisfies due process in a particular proceeding, we must consider the following factors: (1) the private interest affected; (2) the risk of error created by the standard of proof chosen by the state; and (3) the countervailing state interest supporting use of the challenged standard. *Id.* at 758, 102 S.Ct. at 1397. In balancing the factors noted above to determine that proof by a preponderance of evidence did not satisfy due process in a proceeding to terminate parental rights, the *Santosky* Court stressed that only the parents' substantial interest in family integrity was at stake. Both the parents and the child shared the same substantial interest in preserving the family unit from erroneous destruction at the fact-finding stage of a termination proceeding. *Id.* at 759–61, 102 S.Ct. at 1397–98. On the other hand the State had two interests: (1) "a *parens patriae* interest in preserving and promoting the welfare of the child" by providing a permanent home; and (2) an "administrative interest in reducing the cost and burden of such proceeding." *Id.* at 766, 102 S.Ct. at 1401. (emphasis in original). Clearly, only the first interest merited serious consideration in that type of proceeding and, in evaluating the first interest, the Court concluded that the State shared the parents' interest in avoiding erroneous termination because "while there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds." *Id.* at 766–67, 102 S.Ct. at 1401 (emphasis in original). Therefore, because the overriding interest of all parties involved is to protect the natural family from erroneous destruction, the Court concluded that due process is not satisfied by utilization of a proof by a preponderance standard which allocates the risk of error nearly equally between the state and the parents. Rather, due process requires an elevated standard of proof in termination proceedings to indicate a preference for protection of the parents' important interest in maintaining family integrity. *Id.* at 768, 102 S.Ct. at 1402.

In a child protection proceeding, however, the child not only has an interest in family integrity, an interest he shares with his parent, but the child has a substantial interest in protection from a jeopardous environment and it is the safety of the child which is at issue in such a proceeding. *In re Juvenile Appeal,* 189 Conn. 276, 455 A.2d 1313 (1983). The child's interest in safety does not arise in a termination proceeding because, under our statutory structure, when such a proceeding commences, the child is not in a dangerous environment and an erroneous failure to terminate parental rights does not return the child to a dangerous environment; rather, the child remains with his present custodian. *See* 22 M.R. S.A. §§ 4052(2), 4055(1)(A)(1); *see also San-tosky,* 455 U.S. at 766 n. 16, 102 S.Ct. at 1401 n. 16. In contrast, the purpose of a child protection proceeding is to remove the child from or prevent him from returning to an environment jeopardous to his health or welfare. Although the erroneous failure to terminate parental rights has the effect of forcing a child to continue an essentially protected existence in limbo,[9] an erroneous failure to determine that a child's health or welfare are in jeopardy in a child protection proceeding creates a significant risk that the child will remain in or return to a dangerous environment.

The State, as *parens patriae,* represents the important safety interest of the child. *In Re Juvenile Appeal,* 189 Conn. at 298 455 A.2d at 1324. As such, the State has a substantial countervailing interest in the instant proceedings that is not present in a termination proceeding. This interest must be balanced against the substantial interest of the parent in maintaining family integri-

---

**9.** *Santosky v. Kramer,* 455 U.S. 745, 766 n. 16, 102 S.Ct. 1388, 1401 n. 16, 71 L.Ed.2d 599 (1982).

ty. *In Re Juvenile Appeal,* 189 Conn. at 298, 455 A.2d at 1324; *Cf. Custody of a Minor,* 377 Mass. 876, 389 N.E.2d 68 (1979); *see generally Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511 (1978). An erroneous decision against the parents in a child protection proceeding may not only temporarily curtail a parent's right to custody but it could have an adverse emotional effect on a child. On balance, however, both the interests of the state and the parents are substantial and neither seems clearly paramount to the other. We think that an elevated standard of proof does not adequately balance these competing interests because it necessarily indicates a preference for the parents' interest. Although a stricter standard creates a smaller risk that parental rights will be erroneously curtailed in a child protection proceeding, it also creates a greater risk that the child will be forced to remain in or return to a jeopardous environment. Here, especially because the parental rights will at most be temporarily curtailed, we think that the State's interest in protecting a child from the risk of serious and potentially irrevocable harm counterbalances the parents' interest in avoiding an erroneous curtailment of their rights. Accordingly, we conclude that use of proof by a preponderance of the evidence standard reflects that the risk of error should be borne in roughly equal fashion and satisfies due process in a child protection proceeding. *See In Re Juvenile Appeal,* 189 Conn. at 300, 455 A.2d at 1324; *see also Tucker v. Marion County Department of Public Welfare,* 408 N.E.2d 814, 820 (Ind.App.1980); *Custody of a Minor,* 378 Mass. 712, 393 N.E.2d 379 (1979); *see generally Santosky,* 455 U.S. at 790–91, 102 S.Ct. at 1403–04 (Rehnquist, J. dissenting); *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076–77, 25 L.Ed.2d 368 (1970) (Harlan, J. concurring).

The entry is:

Judgment affirmed

All concurring.