1998 ME 243

**In re NIKOLAS E.**

Supreme Judicial Court of Maine.

Argued Nov. 3, 1998.
Decided Nov. 19, 1998.

Mary K. Gonya Brennan (orally), Orono, Guardian ad Litem, for appellant.

J. Hilary Billings (orally), Billings & Silverstein, Bangor, for appellee Valerie E.

Andrew Ketterer, Attorney General, Peter Brann, State Solicitor (orally), Christina Hall and Geoffrey Goodwin, Asst. Attys. Gen., Augusta, for appellee Dept. of Human Services.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

WATHEN, Chief Justice.

[¶ 1] The guardian ad litem of Nikolas E. appeals from a judgment entered in the District Court (Newport, *Clapp, J.*) denying the

child protection petition brought by the Department of Human Services (hereinafter referred to as the "State"). The State sought custody of Nikolas for the limited purpose of approving medical treatment for his HIV condition.[1] The guardian argues on appeal that the court applied an incorrect legal standard and that its factual findings are contrary to the weight of the evidence. Finding no error of law, and concluding that the evidence falls short of compelling a finding in favor of the State, we affirm the judgment.

[¶ 2] The facts presented at trial may be briefly summarized as follows: Nikolas is a four-year-old boy who is HIV positive. Nikolas's mother and father, who are also HIV positive, are divorced and Nikolas lives with his mother who has sole responsibility for his medical care. In January of 1997, Nikolas's sister died at the age of four from complications with AIDS. Nikolas and his mother are under the care of their family physician, Jean Benson, M.D. After learning of a clinical trial program for children with HIV, Dr. Benson referred Nikolas and his mother to a specialist in pediatric infectious diseases, Dr. John Milliken of Bangor. Both the mother and Nikolas's deceased sister had been treated in the past by Dr. Milliken.

[¶ 3] In September of 1997, Dr. Milliken examined Nikolas and met with his mother. He recommended a drug therapy known as highly aggressive anti-retroviral therapy (HAART). Based upon developments in her own illness and her experience with the drug therapy that accompanied the tragic and painful death of her daughter, the mother expressed her distrust of the drug therapy and declined to permit her son to participate at that time. Dr. Milliken, weighing in his mind whether the mother's refusal to provide the therapy to Nikolas constituted neglect, waited for nearly two months before writing his recommendations to Dr. Benson. In November, with updated medical information recommending that all children with HIV infection should be treated for that disease,

Dr. Milliken sent a report to Dr. Benson and provided a copy to the State. In the report he explained his recommendations for treatment and his concern about the mother's decision to forego treatment within the context of her own disease. He suggested that the mother could be offered "a voluntary release of parental rights with residential custody for her," and that medical decisions could be removed from her.

[¶ 4] As a result of Dr. Milliken's report, the State met with the mother and discussed her treatment plans for Nikolas. Because of differing opinions offered by Dr. Benson and Dr. Milliken, the State arranged for the mother and Nikolas to consult with Dr. Kenneth McIntosh, Chief of the Division of Infectious Diseases at Children's Hospital in Boston, Massachusetts. Dr McIntosh is head of the AIDS program at t he hospital and professor of pediatrics at Harvard Medical School. He provided the mother with information regarding treatment and suggested that Nikolas would benefit from HAART therapy. Specifically, the therapy would involve giving Nikolas daily dosages of three different kinds of drugs—two nucleoside analogue reverse transcriptase inhibitors, in this case, d4T and 3TC, and one protease inhibitor, in this case, nelfinavir, for an extended period of time, possibly for his lifetime. Dr. McIntosh saw no irrationality on the part of the mother, and he confirmed that he had never reported parents to child protective agencies for failing to accept his recommendations regarding therapy.

[¶ 5] Later, the mother returned to Dr. McIntosh on her own to discuss the risks and long term effects of the proposed therapy. The District Court summarized the information she obtained on this visit as follows:

Dr. McIntosh gave her all the information currently available from the limited experience the medical community has had in this treatment for children and could not give her any definitive information concerning long term effects. This drug

---

1. Human Immunodeficiency Virus (HIV) is a retrovirus that causes Acquired Immunodeficiency Syndrome (AIDS). The virus invades and eventually kills different cells in the blood and in body tissues, particularly white blood cells known as CD4+ cells. When the CD4+ count drops be-

low 200 cells/mm3 of blood or when CD4+ cells comprise less than 14% of his or her total lymphocytes, a person is regarded as having AIDS. *See Bragdon v. Abbott*, — U.S. —, 118 S.Ct. 2196, 2203–04, 141 L.Ed.2d 540 (1998) (citations omitted).

treatment regimen is still in the evolving stages. Because of stepped-up FDA approval of drugs and programs in this area due to public and political pressure nationwide, all ongoing AIDS treatment programs (especially for children), when compared to traditional methods of approving medical drugs and treatment protocols, are experimental. In effect, treatment is being provided to sufferers of this illness at the same time as statistics and efficacy studies are being conducted. The various regimens are changing constantly, and it is expected that new and more effective drugs and treatment protocols will emerge each year, if not sooner. It can be fairly said that the HAART regimen was still in experimental stages when [the mother] first consulted with Dr. Milliken. The CDC published its guidelines for children's HIV treatment over six months later, making this regimen conventional state of the art.

. . . .

Dr. McIntosh's [sic] feels that because Nikolas's blood tests (viral load count and CD4 cell count) meet the CDC guidelines qualifying him for aggressive drug therapy, the child may well benefit from such treatment. However, this benefit cannot be quantified. No good estimation can be given either on whether or how much longer Nikolas will survive solely because he participates. Dr. McIntosh is of the opinion that no child should be started on this program unless his parents are fully accepting and in support of the treatment.

[¶ 6] The court concluded that the long term effects of the drug therapy were essentially unknown and observed that the mother, although she had not agreed to the therapy at the time of hearing, stated clearly that her mind was not closed on the issue. The court stated that "[a]lthough she would rather spare Nikolas the effects and risks of this treatment, if his health begins to deteriorate significantly, she will reconsider and would now, if ordered, comply with treatment."

2. We commend all participants in this proceeding for their expedition and sensitivity in present-

[¶ 7] Against this factual background, the State in May of 1998, filed a petition for a child protection order, seeking custody of Nikolas so he could receive the treatment recommended by Dr. McIntosh. A guardian ad litem was appointed pursuant to 22 M.R.S.A. § 4005 (1992 & Supp.1997), *amended by* P.L.1997, ch. 715, §§ A–1, A–2 (effective June 30, 1998), and a hearing was held on the petition in September. The court denied the petition and the matter is now before us on an expedited appeal.[2]

### I. Standing

[¶ 8] As a preliminary matter, the mother argues that the guardian lacks standing to prosecute an appeal in a child protection action. She contends that the guardian's rights and duties are limited to those delineated in 22 M.R.S.A. § 4005 and that appealing the court's judgment is not included in the list of rights and duties. The mother also argues that appeal is controlled by 22 M.R.S.A. § 4006, that only an "aggrieved party" may bring an appeal under section 4006, and that neither Nikolas nor his guardian is a party to the child protection hearing.

[¶ 9] The right to appeal from a child protection order is set forth in 22 M.R.S.A. § 4006 as follows:

A *party aggrieved* by an order of a court entered pursuant to section 4035 [child protection order] ... may appeal directly to the Supreme Judicial Court sitting as the Law Court and such appeals are governed by the Maine Rules of Civil Procedure, chapter 9.

... Any attorney appointed to represent a party in a District Court proceeding under this chapter shall continue to represent that client in any appeal unless otherwise ordered by the court.

P.L.1997, ch. 715, § A–3 (effective June 30, 1998) (emphasis added) (codified at 22 M.R.S.A. § 4006). The immediately preceding section is entitled "Parties' rights to representation; legal counsel" and is divided into two subsections: "1. Child; guardian ad litem" and "2. Parents." 22 M.R.S.A. § 4005

ing their views concerning Nikolas's well being.

(1992 & Supp.1997). More specifically, the statute provides that "[t]he guardian ad litem or the child may request the court to appoint legal counsel for the child." 22 M.R.S.A. § 4005(1)(F) (Supp.1997). The section further provides that "[t]he guardian ad litem shall act in pursuit of the best interests of the child." 22 M.R.S.A. § 4005(1)(B) (Supp. 1997), *amended by* P.L.1997, ch. 715, § A–1 (effective June 30, 1998).

[¶ 10] In explaining the constitutionality of the "preponderance of the evidence" standard in a child protection proceeding, we have stated that, unlike a parental termination proceeding, "[i]n a child protection proceeding, . . . the child not only has an interest in family integrity, an interest he shares with his parent, but the child has a substantial interest in protection from a jeopardous environment and it is the safety of the child which is at issue in such a proceeding." *In re Sabrina M.*, 460 A.2d 1009, 1016 (Me.1983). Thus, contrary to the mother's argument, the child has a significant interest in child protection proceedings and is a party to the proceedings. Because the child is a minor, a guardian ad litem is appointed and either the child or the guardian can ask for an attorney to be appointed. In this case, the guardian is an attorney and acts in both capacities. Accordingly, the guardian, as the legal representative of Nikolas, is an aggrieved party and, as such, has standing to prosecute this appeal.

## II. Circumstances of jeopardy

[¶ 11] The guardian argues that the State made a showing sufficient to establish that, by withholding medical treatment, the mother subjected Nikolas to "serious abuse or neglect." In attempting to intervene, the State invoked the Child and Family Services and Child Protection Act, which contains the following statement of purpose:

Recognizing that the right to family integrity is limited by the right of children to be protected from abuse and neglect and recognizing also that uncertainty and instability are possible in extended foster

home or institutional living, it is the intent of the Legislature that this chapter:

**1. Authorization.** Authorize the department to protect and assist abused and neglected children, children in circumstances which present a substantial risk of abuse and neglect, and their families.

**2. Removal from parental custody.** Provide that children will be taken from the custody of their parents only where failure to do so would jeopardize their health and welfare;

22 M.R.S.A. § 4003 (1992), *amended by* P.L. 1997, ch. 715, § B–4 (effective June 30, 1998).

[¶ 12] The State's petition was brought as a child protection petition.[3] The court held a hearing on the petition pursuant to 22 M.R.S.A. § 4035(1) (1992), *amended by* P.L.1997, ch. 715, § A–7 (effective June 30, 1998). The statute requires the court, after hearing the evidence, to "make a finding, by a preponderance of the evidence, whether the child is in circumstances of jeopardy to his health or welfare." 22 M.R.S.A. § 4035(2) (1992). "Jeopardy to health or welfare" or "jeopardy" is defined as "serious abuse or neglect, as evidenced by . . . *[d]eprivation of adequate* food, clothing, shelter, supervision or *care, including health care when that deprivation causes a threat of serious harm.*" 22 M.R.S.A. § 4002(6)(B) (1992) (emphasis added). "Serious harm" is defined in part as serious injury. 22 M.R.S.A. § 4002(10) (1992). The State has the burden to prove by a preponderance of the evidence that a child is in circumstances of jeopardy.

[¶ 13] In the present case, the court described the State's burden and its ruling as follows:

The *initial issue* presented in this case is whether the decision of [the mother] to delay drug therapy for her son is *rational and reasoned.* The court feels that it is. The next issue is whether that decision, despite being the product of a reasoned approach, still places Nikolas's health or welfare in jeopardy by bringing about or threatening serious harm or depriving him

---

3. The State could have filed a petition seeking a medical treatment order pursuant to 22 M.S.R.A. § 4071 (1992).

of health care when that deprivation causes a threat of serious harm. A "threat" as intended in this context is "an indication of imminent danger, harm, evil, etc...."

It is the obligation of the petitioning Department in this matter to prove by a preponderance of the evidence that [the mother's] deprivation of reasonable and effective health care for her son by now refusing to enter him into HIV/AIDS aggressive drug therapy *constitutes an imminent threat of serious harm.* The Department has proven that according to the current conventional medical wisdom in the relatively new and rapidly evolving art of treating children with certain elevated levels of HIV in the blood, that Nikolas would benefit from such treatment. However, it has *not sufficiently prove [sic] what that benefit will likely be and that no significant injury or harm may ultimately befall the child if that therapy is now commenced....* [W]ith the relative uncertainty of the efficacy of the proposed treatment, it can only reasonably be left up to the parent to make an informed choice in this regard. (emphasis added).

[¶ 14] The State did not file an appeal in this matter and concedes that the evidence that it presented at the hearing would support a ruling either way on the issue of jeopardy. In its brief as appellee, however, it questions whether the court may have interjected erroneously the issue whether the mother's decision to delay drug therapy is rational and reasoned. The guardian argues on appeal that the court erred in applying the legal standard in three other respects: First, in framing the issue of whether the acts of the mother threatened serious harm, the court erroneously added the concept of "imminence"; second, by adding a requirement that the State prove that no significant injury or harm would befall Nikolas if the treatment plan were implemented; and, third, by failing to address the best interests of Nikolas, focusing instead on the mother's interest, vis-a-vis the State.

[¶ 15] The State's argument with reference to the finding that the mother's decision is rational and reasoned establishes no legal error. Although we have stated that the statute is "designed to protect children from circumstances that threaten serious harm, and the defined interest of the state is not confined to those circumstances that are the fault of the parent," *In re Shawn H.*, 667 A.2d 1377, 1379 (Me.1995), the court's remarks were appropriate within the context of the evidence. Dr. Milliken opined that the mother was incapable of managing her son's medical care. Perhaps because of her own illness and the unsuccessful treatment of her daughter, she undoubtedly exercised an unusual degree of independence and skepticism in medical decision-making. Dr. McIntosh, on the other hand, observed no irrationality on the part of the mother. In resolving this factual disagreement, the court did not elevate the finding to a statutory requirement. It made a subsidiary factual finding to permit a fair evaluation of the conflicting evidence. In any event, the court proceeded to qualify the question of rationality by stating "the next issue is whether that decision, despite being the product of a reasoned approach, still places Nikolas's health or welfare in jeopardy." Thus, the determination that the mother's decision was rational and reasoned assisted the court in evaluating the evidence and resulted in no misapplication of the law.

■ [¶ 16] Both the guardian and the State argue that the court erroneously required that the threat of harm to Nikolas be imminent. "Threat" is not defined in the statute. The court defined "threat" as requiring an indication of imminent danger. The State argues that the requirement of imminence connotes an immediate risk of serious harm that is the basis for requesting a preliminary protection order pursuant to 22 M.R.S.A. § 4034(2) (1992), prior to a hearing on the final protection petition. Accordingly, to require immediate harm in both the preliminary petition and the final petition would fail to recognize the separate and distinct purposes of each request. Further, in *In re Jeffrey E.*, 557 A.2d 954 (Me.1989), we explained that "[i]n order for a court to take into account the special medical needs of a child, a present medical emergency need not exist, nor does such a medical emergency have to be imminent or even certain to re-

cur." *Id.* at 956. It follows then that, if the medical emergency need not be imminent, any harm relating thereto need not be imminent, and, in fact, the Child Protection Act contains no requirement that the harm be imminent.

■ [¶ 17] In the present case, however, the court was called upon to decide whether it should override the mother's decision to "wait and see" if Nikolas's health began to deteriorate significantly before accepting treatment. The court's failure to find that the mother subjected her son to an imminent threat of serious harm must be considered in connection with the court's conclusions regarding the efficacy of the proposed drug therapy. In effect, the court was unpersuaded by the evidence that the mother was subjecting her son to a serious risk of harm merely by *delaying* the decision to accept a course of treatment of uncertain efficacy.

[¶ 18] Similarly, with respect to the guardian's argument that the court added a requirement that the State prove that no significant harm would ultimately befall Nikolas from the treatment, we find that the court did not treat this conclusion as a required element of proof pursuant to the statute. It appropriately considered the effectiveness and safety of the treatment as one of the subsidiary factual issues in its determination of jeopardy.

[¶ 19] Although the court did not explicitly articulate and discuss all of the competing interests—the interests of the parent, the interests of the state, and the best interests of the child—and did not expressly balance the benefits and risks of treatment against the benefits and risks of delaying treatment, the court's findings implicitly reflect that the appropriate factors were weighed. The court found, for example, that although the State produced opinion evidence that Nikolas would benefit from treatment, the State did not produce evidence to persuade the court that there was a quantifiable benefit. The court also was unable to determine the likely effects of the treatment on the child. The court accepted as accurate that the drugs used in the therapy "are very potent and cause often unpleasant side effects." The court also found that the State was unable to

produce evidence of the likely long-term side effects because the treatment is essentially new and experimental. The court also found that "removal of Nikolas from his home would have a severe and detrimental effect on his well-being." Implicit in the court's conclusion that the mother's decision does not constitute serious parental neglect is the express finding that the court is unpersuaded of the overall efficacy of the proposed treatment despite the recommendations of the physicians. Thus, the court did not apply an improper legal standard in reaching its decision.

[¶ 20] The guardian argues that the evidence compels the conclusion that the medical treatment is beneficial and that the mother's refusal constitutes jeopardy. She argues that the court's finding that the mother's refusal is rational and reasoned is contrary to the weight of the evidence and that the court plainly erred in assessing the evidence concerning the treatment of AIDS.

■ [¶ 21] We review the court's factual findings for clear error. Because the court based its decision on a determination that the State failed to establish sufficient facts to support its petition and because the State bears the burden of proof, "[s]uch a determination may be reversed on appeal only if the evidence in support of the [petition] was of such a nature that the factfinder was compelled to believe it and to draw therefrom the requested inference to the exclusion of any other." *Luce Co. v. Hoefler*, 464 A.2d 213, 215 (Me.1983). In this case, although there was evidence that would support the guardian's argument that Nikolas was in circumstances of jeopardy, the evidence does not compel such a finding to the exclusion of any other. The credibility and weight of the evidence is within the province of the factfinder.

[¶ 22] Viewing Dr. McIntosh's testimony as the strongest evidence offered in favor of the State's position, it falls short of compelling a finding of serious child abuse or neglect. Even though there is significant evidence from Dr. McIntosh that he believes, based on the clinical trials, his expertise in this field, and his examination of Nikolas,

that Nikolas would benefit from this treatment, there is also competent evidence from Dr. McIntosh that the theories on AIDS are still evolving, that this treatment has not been given for a long period of time, that the information on effects and prognosis are being studied on the children receiving treatment and therefore the longterm effects cannot be identified and that, although he believes a cure along the same lines as the present therapies is not likely, a person could lessen the chances of getting a good response to subsequent medications because of a resistance that could be built up from the therapy in question. The State concedes that Dr. McIntosh's testimony alone is sufficient to support either factual conclusion. We agree. Thus, the court was not clearly erroneous in remaining unpersuaded that jeopardy had been established.

[¶ 23] We emphasize that the decision required the trial court to weigh the interests of the State, the child, and the parents, and to balance the benefits and risks of treatment against the benefits and risks of declining treatment. If the child's health should change, if the treatment efficacy should be demonstrated to be better than it is now known to be, or if better treatment options should become available, that balance could shift in favor of treatment. Neither the parents nor the State should assume that the trial court's decision, affirmed by our opinion today, is necessarily the final word on treatment for Nikolas.

The entry is:

Judgment affirmed.

