889 A.2d 1153

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES PLAINTIFF, v. L.V. AND C.M., DEFENDANTS.

IN THE MATTER OF C.M.

Superior Court of New Jersey
Chancery Division Family Part
Passaic County

Decided August 3, 2005.

*Peter C. Harvey*, Attorney General, for New Jersey Division of Youth and Family Services (*Christian Arnold*, Deputy Attorney General, appearing).

*Yvonne Smith Segars*, Public Defender, Law Guardian, for C.M. minor child (*Gillian Hemstead*, Assistant Deputy Public Defender, appearing).

*Yvonne Smith Segars*, Public Defender, for L.V. (*Sheryl Allen*, Assistant Deputy Public Defender, appearing).

*Yvonne Smith Segars*, Public Defender, for C.M. (*Leah Bourne*, Designated Counsel, appearing).

ROTHSTADT, J.S.C.

The Division of Youth and Family Services ("DYFS") filed an action against the defendant, L.V. (hereinafter "the mother"), alleging her abuse and neglect of her baby, who was born on January 10, 2005. On June 9 and July 14, 2005, the court conducted a fact finding hearing as to DYFS's allegation regarding the mother's alleged abuse and neglect. That allegation related solely to the mother's refusal to take certain medications, during her pregnancy, to reduce the risk that the baby would be born HIV positive. For the reasons set forth below, this court is convinced that, despite the undisputed facts, DYFS failed to meet its burden to prove that the mother committed an act of abuse or neglect.

At the hearing, the mother testified credibly during the course of attempting to stipulate to an act of abuse or neglect and to explain her actions. The mother admitted that while she was pregnant with her child she learned, for the first time, that she was HIV positive. Further, the mother admitted that despite advice she received from the nurse who treated her, she refused to regularly take medication that was intended to reduce the chance that her baby would be HIV positive. She refused to take the medication on a regular basis because she simply could not accept the fact that she contracted the disease.

DYFS supplemented the mother's admission with the testimony of the nurse practitioner who provided prenatal treatment for the mother.[1] That nurse, Ann M. Scanlon–Smith, specialized in the

---

[1] DYFS offered the additional testimony because the court previously expressed its reluctance to accept the stipulation as a basis for it finding abuse or neglect.

treatment and care of HIV mothers and infants for the past seventeen years. She testified credibly both as to her treatment and conversations with the mother and as to her expert opinion regarding current treatment methods available to HIV-positive pregnant women. Those treatments include antiretroviral (drug) therapy, which is designed to reduce the risk of the virus being passed to a newborn baby.

However, Scanlon also reported [2] that all babies born to mothers who are HIV positive carry their mother's antibody to HIV in their blood, even if the medication is taken during the pregnancy. Therefore, initial tests on all children of HIV-positive mothers can positive for HIV. However, as the mother's antibodies die off and the baby's immune system matures and produces antibodies to environmental antigens, the child can ultimately test negative for the virus. This is known as seroreversion. At the hearing, the parties therefore agreed that, even where the virus initially appears in a child, the virus can disappear from the child within its first eighteen months of development [3]. They also agreed that an initial negative result can change to a positive result during that time.

According to Ms. Scanlon, the recommended therapy reduced the risk of passing the virus to the baby from twenty-eight percent to seven percent. In other words, pregnant women who test positive for HIV and who do not take the medication expose their babies to a twenty-eight percent chance that the virus will be transmitted at birth. The same women who take the medication reduce the risk to approximately a seven-percent chance of passing the virus to their babies. Moreover, in Scanlon–Smith's

---

[2] DYFS supplemented Scanlon–Smith's testimony with her written report, which the court admitted into evidence without objection.

[3] Babies born positive for HIV and later testing negative for the virus as they mature, requiring no further treatment, have been seen in other recent cases. *See* n. 4 *infra.*

experience, none of her patients who strictly followed their thera-
peutic regimes ever passed the virus to their child.

Thus, even when a pregnant mother does not take the medi-
cation at all, there is a seventy-two percent chance that the child
will not be HIV positive. Further, even if a baby is HIV positive
at birth, the virus may disappear. Whenever a baby is exposed to
the virus, it, however, is standard procedure to treat the baby for
the virus using various medications until the virus disappears.
The medication, however, does not cause that disappearance.
Instead, its disappearance is evidently attributable to the child's
development during its first eighteen months.

Scanlon–Smith confirmed that she prescribed the therapeutic
medications to the mother in this case. In addition, she informed
the mother of the therapy's benefits and counseled her to take the
drugs as prescribed on a regular basis. However, during her
pregnancy, the mother failed to take the medications with any
regularity, if at all.

As noted, the mother gave birth to the baby on January 10,
2005. Although the parties agreed that the child was exposed to
the virus, there was no evidence that the baby actually tested
positive for HIV.[4] Also, DYFS did not present any evidence that
the baby suffered any physical harm, injury, or disability as a
result of being exposed to the virus. The baby evidently suffered
from other serious health problems, unrelated to her exposure to
HIV.

After the hospital medically cleared the baby, DYFS trans-
ferred her to foster care and then to a hospital for medically
fragile infants. She is now receiving all of the medical treatment
she requires. The mother confirmed that she would insure that
the baby continue to receive her necessary medical treatment if
the court were to place the baby back in her custody and care.
(The mother made this promise even though it is not clear if she

---

[4] In fact, counsel all agreed during summations that the only test administered
to the baby to date came back negative for HIV.

has the financial ability to insure that such treatment will be provided).

▉ Based on this credible evidence, this court is satisfied that DYFS did not satisfy its burden of proof. Pursuant to New Jersey's child abuse, neglect and cruelty statutes ("the Act"), DYFS must establish at a fact-finding hearing, by a preponderance of the evidence, that the baby was an abused or neglected child. *N.J.S.A.* 9:6–8.44; *N.J.S.A.* 9:6–8.46(b). The fact-finding process under the Act is a significant and necessary check on DYFS's actions. Its focus centers upon the question of whether the parent under consideration caused injury to the child and, if not, whether the parent is likely to do so in the future. *New Jersey Div. of Youth and Family Servs. v. S.S.*, 372 *N.J.Super.* 13, 23–24, 855 *A.2d* 8 (App.Div.2004), cert. den. 182 *N.J.* 426, 866 *A.2d* 983 (2005).

▉ The Act defines an "abused or neglected child" as a child, less than eighteen years of age, whose parent;

(1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court; (5) or a child who has been willfully abandoned by his parent or guardian, as herein defined; (6) or a child upon whom excessive physical restraint has been used under circumstances which do not indicate that the child's behavior is harmful to himself, others or property; (7) or a child who is in an institution and (a) has been placed there inappropriately for a continued period of time with the knowledge that the placement has resulted or may continue to result in harm to the child's mental or

physical well-being or (b) who has been willfully isolated from ordinary social contact under circumstances which indicate emotional or social deprivation. *N.J.S.A.* 9:6–8.21(c).

The question here then was whether the mother's failure to take the prescribed medication during her pregnancy, after being told of its benefits, constituted one of the definition's descriptions of an act of abuse or neglect.

Apparently, there is no case law in this state that previously addressed these narrow circumstances [5]. Another state's supreme court addressed a mother's decision to withhold treatment for her HIV-positive four year old child. That court held that her refusal to have her child treated was not a basis for issuing a child protective order. According to that court, the benefit of the proposed treatment was not clearly established by expert testimony. *In re Nikolas E.*, 720 A.2d 562 (Me.1998). Here, DYFS's expert established the treatment benefit. The question before this court deals with the mother's decision during her pregnancy after being advised of that statistically established benefit.

Since there is no applicable case law, DYFS argued to the court that the situation *sub judice* was analogous to a pregnant mother's use of illegal drugs during her pregnancy. Clearly, it is well settled that where a mother abuses narcotics or alcohol during her pregnancy, and her abuse results in her child being

---

[5] The only case found with a similar fact pattern in New Jersey involved a federal court action by a mother against DYFS. The federal court's decision only addressed her standing and claims, not the question presented in this case. However, in that case, the mother tested positive for HIV during her pregnancy. She, too, refused to take the prescribed medications during her pregnancy. There, however, when DYFS learned of her decision through a referral from her prenatal care provider, DYFS responded by telling the referent to contact DYFS after the baby was born because the situation was not ripe for DYFS intervention. At birth, the baby initially tested positive for HIV and the mother refused treatment for the baby. DYFS then obtained an order for medical guardianship, but the baby was returned to his mother's physical custody. Later, the mother stopped administering the required medication. DYFS obtained an order that the baby be treated in the hospital. However, five months after the baby's birth, he tested negative for HIV. The court then dismissed the entire matter from litigation. *Doe v. DYFS, et. al.*, 148 *F.Supp.*2d 462, 471–473 (D.N.J.2001).

born addicted to drugs and forced to suffer the consequences of that addiction, the mother can be shown to have abused or neglected her child. *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 349–351, 736 *A.*2d 1246 (1999). However, it is the attendant suffering to the child, after birth, that a court must rely on in making a finding of abuse or neglect under those circumstances. The mother's decision to use narcotics or alcohol during her pregnancy alone is an insufficient basis for a finding of abuse or neglect. To otherwise hold a mother culpable for her incorrect decision would be an unauthorized punishment for her "past transgressions against the child in utero or in esse." *Id.* at 351, 736 *A.*2d 1246, quoting *In re Guardianship of A.A.M.*, 268 *N.J.Super.*, 533, 549, 634 *A.*2d 116 (App.Div.1993) (Kestin concurring).

■ This proscription against finding that a mother committed an act of abuse or neglect against her child by her actions before the child's birth, without attendant suffering or injury after birth, recognizes that the protections afforded by the Act are limited to the child's situation after his or her birth and not while a fetus. Also, since the Act clearly does not expressly include a fetus in its definition of a child, its protection does not extend to the child before birth. *See e.g. Giardina v. Bennett*, 111 *N.J.* 412, 421–425, 545 *A.*2d 139 (1988) [holding that New Jersey's Wrongful Death Act did not apply to an unborn child's death]. This conclusion is equally supported by the express provisions of the Act, which contemplate the removal and placement of an abused and neglected child into DYFS's custody. Those provisions simply could not apply to a fetus. *See State v. Kruzicki*, 209 *Wis.*2d 112, 127, 561 *N.W.*2d 729 (1997).

■ The Act, therefore, does not and cannot be construed to permit government interference with a woman's protected right to control her body and her future during her pregnancy. *See Planned Parenthood of Cent. New Jersey v. Farmer*, 165 *N.J.* 609, 631–632, 762 *A.*2d 620 (2000). DYFS cannot, therefore, interfere with a competent woman's control of her body and fetus by holding the Act's provisions over her head as a "sword of Damo-

cles." The decisions she makes as to what medications she will take during her pregnancy, (as compared to controlled dangerous substances), are left solely to her discretion after consultation with her treating physicians. The right to make that decision is part of her constitutional right to privacy, which includes her right to control her own body and destiny. Those rights include the ability to refuse medical treatment, even at the risk of her death or the termination of her pregnancy. *See, generally, Matter of Conroy,* 98 *N.J.* 321, 353, 486 *A.*2d 1209 (1985); *Right to Choose v. Byrne,* 91 *N.J.* 287, 305, 450 *A.*2d 925 (1982), and *Matter of D.K.,* 204 *N.J.Super.* 205, 212—214, 497 *A.*2d 1298 (Ch.Div.1985).

While the mother's decision here may not have been one that another would have made (especially one who did not walk in her shoes), it can not, therefore, be the basis for a finding of abuse or neglect. Her decision did not involve the intentional use of controlled dangerous substances. It related solely to recommended medical treatment. Her decision about that treatment was protected from any interference, even considering the fact that the baby was born exposed to HIV.

In addition, even if the court considered the mother's refusal to take the recommended medication during her pregnancy to be questionable, there simply was no evidence that the baby even tested positive for HIV or suffered from any condition relating to her exposure to that virus. Even if there was evidence that the baby initially tested positive for the virus, the evidence also established that the virus could disappear as the baby developed. Moreover, the evidence established that even if the mother took the medication, there was no guarantee that the baby would not be born HIV positive. The medication only reduced that risk; it did not eliminate the risk.

Here, then the court focused solely on the baby's condition and situation at the time of her removal in order to determine whether the baby is an abused or neglected child. *New Jersey Div. of Youth and Family Servs. v. S.S., supra.* The court did so while considering the Act's paramount concern of insuring the baby's

safety and its goal of returning the baby to her home if that could be accomplished safely. *N.J.S.A.* 9:6–8.8.

After considering the safety of the baby in the light of the evidence presented at the fact-finding hearing, this court was satisfied that DYFS failed to meet its burden. Although the baby suffered from several maladies, none of them were shown to be the result of the mother's actions. Specifically, there was no evidence that the mother harmed the child or refused to insure that the child received that which she required, including necessary medical care. There simply was no proof of abuse or neglect.

Today, the mother is not interfering with the baby's treatment and agrees to continue the treatment when her child is returned to her. Thus, there is no evidence that the mother is likely to abuse or neglect the baby in the future.[6] Under these circumstances, it cannot be said that the mother caused or will cause the baby to suffer any pain or injury or that she seeks to deprive her of any necessary medical treatment. The baby is therefore neither an abused or neglected child as defined by the Act.

As there is no finding of abuse or neglect, the complaint alleging abuse or neglect will be dismissed. *N.J.S.A.* 9:6–8.50(c). However, the baby's legal custody will not be transferred back to the mother. The court is concerned about the mother's present ability to provide the continued medical treatment the baby requires. Thus, the action for custody, care and supervision is sustained and will continue for a period of six months, unless extended after a summary hearing to be scheduled on notice to all parties. *N.J.S.A.* 30:4C–11; 30:4C–12. DYFS is to insure that the baby and the mother are able to receive all necessary treatment to address the baby's medical needs. The mother is not to make any attempt to remove the baby from her placement at the

---

[6] The Law Guardian argued that evidence of the mother's decision to not take the recommended medication is proof of that likelihood. The court disagreed since it did not believe that decision was any indication that the mother would not attend to the baby's need in the future.

O'Neill Center at St. Joseph's Hospital Medical Center without further order from the court.