ESTATE OF Seymour M. ROSEN.

Supreme Judicial Court of Maine.

Argued May 12, 1982.
Decided July 21, 1982.

Strout, Payson, Pellicani, Cloutier, Hokkanen, Strong & Levine, Arthur E. Strout (orally), Rockland, for Phoebe Rosen and Jeffrey Rosen.

Harmon, Jones & Sanford, John J. Sanford (orally), Camden, for Estate.

Richard A. McKittrick, Camden, for Penobscot Bay Medical Center.

Before McKUSICK, C. J., and GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

GODFREY, Justice.

Phoebe Rosen and Jeffrey Rosen, widow and son of the decedent, Seymour M. Rosen, appeal from an order of the Knox County Probate Court admitting the decedent's will to probate. Appellants argue that the decedent lacked the testamentary capacity necessary to execute a valid will and that the Probate Court's finding that he did have the necessary capacity is clearly erroneous. On direct appeal from the Probate Court pursuant to section 1–308 of the Probate Code (18–A M.R.S.A. § 1–308), this Court reviews for clear error the findings of fact by the Probate Court. *Estate of Mitchell*, Me., 443 A.2d 961 (1982). We affirm the judgment.

Decedent, a certified public accountant, had an accounting practice in New York City, where he had been married to Phoebe for about thirty years. Their son, Jeffrey, works in New York City. In 1973, the decedent was diagnosed as having chronic lymphatic leukemia, a disease that, as it progresses, seriously impairs the body's ability to fight infection. From 1973 on, he understood that he might die within six months. In June, 1978, he left his home and practice and moved to Maine with his secretary of two months, Robin Gordon, the appellee. He set up an accounting practice in Camden.

The leukemia progressed. The decedent was on medication and was periodically hospitalized for infections, sometimes involving septic shock, a condition described by the treating physician as akin to blood poisoning. The infections were treated with antibiotics with varying degrees of success. Despite his medical problems, the decedent continued his accounting practice, working usually three days a week, until about two

months before his death on December 4, 1980. Robin Gordon lived with him and attended him until his death.

While living in New York, the decedent had executed a will leaving everything to his wife or, if she should not survive him, to his son. In November, 1979, decedent employed the services of Steven Peterson, a lawyer whose office was in the same building as decedent's, to execute a codicil to the New York will leaving all his Maine property to Robin. At about this time, decedent negotiated a property settlement with his wife, who is now living in Florida. He executed the will at issue in this proceeding on July 25, 1980, shortly after a stay in the hospital with a number of infections, and shortly before a hospitalization that marked the beginning of the decedent's final decline. This will, which revoked all earlier wills and codicils, left all his property, wherever located, to Robin, or to Jeffrey if Robin did not survive him.

The court admitted the 1980 will to probate over the objections of Phoebe and son, making extensive findings to support its conclusion that "the decedent clearly had testamentary capacity when he executed his Will."

The Probate Court applied the standard heretofore declared by this Court for determining whether a decedent had the mental competence necessary to execute a valid will:

A 'disposing mind' involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds; and a disposing memory exists when one can recall the general nature, condition and extent of his property, and his relations to those to whom he gives, and also to those from whom he excludes, his bounty. He must have active memory enough to bring to his mind the nature and particulars of the business to be transacted, and mental power enough to appreciate them, and act with sense and judgment in regard to them. He must have sufficient capacity to comprehend the condition of his property, his relations to the persons who were or should have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.

*In re Leonard*, Me., 321 A.2d 486, 488–89 (1974), *quoting Hall v. Perry*, 87 Me. 569, 572, 33 A. 160, 161 (1895).

 Appellants portray the decedent as "a man ravaged by cancer and dulled by medication," and it is true that some evidence in the record tends to support this characterization. However, the law as set out in *In re Leonard* requires only a modest level of competence ("the weakest class of sound minds"), and there is considerable evidence of record that the decedent had at least that level of mental ability and probably more:

1. The three women who witnessed the will all testified that decedent was of sound mind. They worked in the same building as the decedent, knew him, and saw him regularly. Such testimony is admissible to show testamentary capacity. *In re Leonard*, 321 A.2d at 489.

2. Lawyer Peterson, who saw the decedent daily, testified that he was of sound mind. Peterson used the decedent as a tax adviser, and the decedent did accounting work for Peterson's clients. Peterson had confidence in the decedent's tax abilities and left the tax aspects of the will to the decedent's own consideration.

3. Dr. Weaver, the treating physician, testified that although the decedent would be mentally deadened for a day or two while in shock in the hospital, he would then regain "normal mental function." Though on medication, the decedent was able to conduct his business until soon before his death. Dr. Weaver testified without objection that on one occasion he had

offered a written opinion that the decedent was of sound mind.

 Appellants' principal objection to the will is that the decedent lacked the necessary knowledge of "the general nature, condition and extent of his property." *In re Leonard*, 321 A.2d at 488. The record contains testimony of Robin Gordon and lawyer Peterson that decedent did not know what his assets were or their value. However, there is other evidence, chiefly Peterson's testimony about his discussions with the decedent preliminary to the drafting of the 1980 will and, earlier, when the 1979 codicil to the New York will was being prepared, that the decedent did have knowledge of the contents of his estate. He knew that he had had a Florida condominium, although he was unsure whether this had been turned over to his wife as part of the recent property settlement; he knew that he had an interest in an oil partnership, and, although he was unable to place a value on that interest, he knew the name of an individual who could supply further information about it; he knew he had stocks and bonds, two motor vehicles, an account at the Camden National Bank, and accounts receivable from his accounting practice.

■ The law does not require that a testator's knowledge of his estate be highly specific in order for him to execute a valid will. It requires only that the decedent be able to recall "the general nature, condition and extent of his property." *In re Leonard*, 321 A.2d at 488. Such knowledge of one's property is an aspect of mental soundness, not an independent legal requirement as the appellants seem to suggest. Here, there was competent evidence that the decedent had a general knowledge of his estate. The Probate Court was justified in concluding that, in the circumstances, the decedent's ignorance of the precise extent of his property did not establish his mental incompetence. The decedent's uncertainty about his property was understandable in view of the fact that some of his property had been transferred to his wife in the recent property negotiations in circumstances rendering it possible that the decedent might have wanted to put the matter out of his mind. Also, there was evidence from which the court could have inferred that much of the property was of uncertain or changing value.

On the evidence of record, this Court cannot hold that the findings of the Probate Court were clearly erroneous. Where, as here, there is a choice between two permissible views of the weight of the evidence, the findings of the Probate Court must stand. *Estate of Mitchell*, Me., 443 A.2d 961 (1982).

The entry is:

Judgment affirmed.

All concurring.