**ESTATE OF Herbert Alton RECORD, Jr.**

Supreme Judicial Court of Maine.

Argued Nov. 5, 1987.
Decided Dec. 31, 1987.

Robert E. Mullen (orally), Linnell, Choate & Webber, Auburn, for plaintiff.

Jill A. Checkoway (orally) Charles H. Abbott, Skelton, Taintor & Abbott, Auburn, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, SCOLNIK and CLIFFORD, JJ.

CLIFFORD, Justice.

Clifford Dow, the proponent of the last will and testament of the decedent, Herbert Alton Record, Jr., appeals from a judgment of the Oxford County Probate Court denying formal probate of Record's will and granting Glendon Richard's [1] petition for a formal adjudication of intestacy. Dow contends that the Probate Court's findings that the decedent lacked testamentary capacity and that the will was the product of undue influence were clearly erroneous. Dow further argues that the Probate Court committed reversible error by adopting verbatim the appellee's proposed findings of fact and conclusions of law and urges that the matter be remanded for a new hearing. Because we conclude that the Probate Court's findings are supported by competent evidence in the record, we affirm.

Herbert Alton Record, Jr., a resident of Buckfield, was admitted to Central Maine Medical Center in late May of 1986. He was later diagnosed as having leukemia, from which he died on July 5, 1986. On June 30, 1986, having been told that he had only a short time to live, Record executed the will that is at the center of this controversy. The will named Clifford Dow as the sole beneficiary and nominated him as the personal representative.

On July 11, 1986, Richard filed a petition for formal adjudication of intestacy and for appointment of himself as personal representative of his father's estate pursuant to 18–A M.R.S.A. § 3–402(b) (1981). On July 16, 1986, Clifford Dow filed a petition pursuant to section 3–402(a) for formal probate of Record's will and for appointment of Dow as the personal representative.

After a hearing, the Oxford County Probate Court granted Richard's petition and denied Dow's, concluding that the decedent lacked testamentary capacity and was a victim of Dow's undue influence at the time the will was executed. From that judgment Dow took this appeal.

Glendon Richard, as the contestant of the will offered for probate, had the burden at trial of proving either the dece-

---

1. Glendon Richard is the natural son of the decedent. He was adopted by another man when 3 months old but he returned to live with his natural father for two or three years beginning in 1969. After spending a few years out of state, Glendon returned to Maine in 1982. He visited his father three or four times a month before Record went into the hospital and much more regularly once he entered the hospital. According to Richard, his relationship with the decedent had been "good" over the last couple of years.

dent's lack of testamentary capacity or the exertion of undue influence. 18–A M.R.S. A. § 3–407 (1981). The Probate Court found Richard to have met this burden as to both issues. On appeal to the Law Court under 18–A M.R.S.A. § 1–308 (1981), these factual findings must stand unless clearly erroneous. *Estate of Mitchell*, 443 A.2d 961, 963 (Me.1982). Each of the Probate Court's findings of lack of testamentary capacity and undue influence is independently sufficient to support the disallowance of the will.

## I. LACK OF TESTAMENTARY CAPACITY

■ *In re: Will of Loomis*, 133 Me. 81, 174 A. 38 (1934), states that testamentary capacity requires on the part of the testator

a knowledge, in a general way, without prompting, of his estate, and an understanding of the disposition he wished to make of it by his will, and of the persons and objects he desired to participate in his bounty. This includes a recollection of those related to him by ties of blood and affection, and of the nature of the claims of those who are excluded from participating in his estate.

*Id.* at 85–86, 174 A. 38; *Estate of Mitchell*, 443 A.2d at 963. In assessing whether the testator was of "sound mind" when he made his will, evidence of the testator's behavior during a reasonable period before and after the execution of the will is admissible to show his capacity. *Waning, Appellant*, 151 Me. 239, 252, 117 A.2d 347 (1955); *Estate of Turf*, 435 A.2d 1087, 1089 n. 5 (Me.1981).

■ The Probate Court's finding of testamentary incapacity was based in large measure on evidence tending to show that on June 30, 1986, the decedent was mentally confused as a result of the advanced stages of his illness and the medications he had received.

Margarette DiPompo, a sister of the decedent who visited him in the hospital regularly, testified that in the last few days of his life Record "just laid there ... and he didn't talk or anything." Perley Dunn, the decedent's cousin, likewise testified that Record "went downhill very fast" and that he couldn't talk or make a fist on June 30, 1986. Notations made by physicians and nurses on the decedent's medical chart in late June also attested to his poor mental and physical condition at the time the will was executed. Record's treating physician described his condition on June 28th as "mentally confused," "condition poor." The decedent's condition essentially remained "clinically unchanged" through June 30th. On July 1st, the day after the will was executed, the nurse's notes include the comment "does not respond appropriately when spoken to."

According to hospital records, Record was administered several medications on the day the will was executed. Lisa Therrien, an LPN stationed on the floor of Central Maine Medical Center where the decedent was a patient, and one of the subscribing witnesses to the will, testified that Record received sleeping pills on June 30th. This medication is capable of causing disorientation and coma, Therrien testified. The decedent also received, just thirty minutes before executing his will, Tylenol with codeine, capable of causing shakiness and, at times, hallucinations. Record also received an antibiotic known to cause sleepiness and drowsiness.

The Probate Court's finding that Record lacked testamentary capacity was based not only upon the decedent's general mental confusion at the time the will was executed, but also upon his failure to understand the natural objects of his bounty. On the day the will was executed Record twice denied that he had a son. Linda Sue Smith, a paralegal who interviewed Record on the afternoon of June 30, 1986, in order to assist Record in the making of his will, testified that, in response to her question as to whether he had children, Record answered "No." William Hardy, an attorney who arranged the execution of Record's will later that evening, testified that when he asked the decedent about his relatives,

he claimed to have only a sister and cousins. Yet the evidence clearly establishes that Record had earlier known and acknowledged that Glendon Richard was his son. Margarette DiPompo, the decedent's sister, testified that Richard was Record's natural son. Record and his son "got along good at times" and the decedent "thought a lot of his son." Richard had lived with the decedent for an extended period of time after his discharge from the service in 1969. According to Richard, his father had told him that the family assets would eventually be handed down to him.

Although there was evidence tending to demonstrate Record's testamentary capacity, the evidence is for the trial judge to weigh and assess, and we cannot say as a matter of law that the trial judge erred in finding that Record lacked testamentary capacity. *Harmon v. Emerson,* 425 A.2d 978, 982 (Me.1981).

## II. UNDUE INFLUENCE

▮▮ According to *In re Will of Fenwick,* 348 A.2d 12 (Me.1975), prominent among the circumstances tending to show undue influence are

1) the existence of a confidential relationship between the testator and the one who is asserted to have influenced him;

2) the fact that the testator has disposed of his property in an unexpected or unnatural manner.[2]

*Id.* at 15; *Estate of Turf,* 435 A.2d at 1090.

There is substantial evidence in the record to support the finding that a confidential relationship existed between the decedent and Clifford Dow, affording Dow the opportunity to exercise undue influence and affect the decedent's volition. *See Sheets v. Estate of Sheets,* 345 A.2d 493, 495 (Me.1975). Dow testified that his relationship with Herbert Record had only be-

gun a short time before Record entered the hospital, but that he had visited Record almost every day throughout Record's six-week period of hospitalization. Dow also played a conspicuous role in facilitating the making of the decedent's will. Either Dow or his girlfriend first contacted the attorney who assisted with the will on June 30, 1986. When a paralegal from the attorney's office arrived at the hospital later that day to interview Mr. Record, Dow and his girlfriend spoke privately with her for ten minutes before she spoke with the decedent. Sometime on June 30, 1986, Dow provided the paralegal with his date of birth and mailing address, which later appeared as unnecessary information in the will. There was evidence that Dow misrepresented himself to hospital personnel as Record's nephew.[3]

The inference of undue influence is strengthened by the evidence of Record's mental infirmity caused by his illness and his medication. As Record's medical condition deteriorated, the Probate Court would have been justified in concluding that his capacity to resist Dow's influence also was diminished. *See In re Will of Fenwick,* 348 A.2d at 15–16.

The record also contains evidence supporting the determination that Record's devise to Dow was unexpected and unnatural. Record had made no will before entering the hospital and, according to witnesses, had insisted that he had no desire to make a will. Richard testified that his father had told him that the family assets that had been handed down to him would eventually pass to Richard in the same way. Finally, the decedent's sister testified that the family farm, the primary asset of Record's estate, was owned by Record and his sisters as tenants in common. The fact that the decedent made such an unlikely disposition of his one-third share of the

---

2. We said in *Fenwick* that proof of these circumstances does not raise a presumption of undue influence but merely permits the drawing of an inference of undue influence. *Fenwick,* 348 A.2d at 15.

3. Dow was a distant relative of Record but not a nephew. He testified that he represented himself as a nephew for the purpose of being allowed access to Record in the intensive care unit of the hospital.

family farm may be given significant weight by the factfinder. *Fenwick*, 348 A.2d at 15; *Estate of Turf*, 435 A.2d at 1090. Although the evidence on the issue of undue influence would likewise support a contrary finding, we will not substitute our judgment for that of the trial judge. *Harmon*, 425 A.2d at 982.

### III. PROBATE COURT'S VERBATIM ADOPTION OF APPELLEE'S PROPOSED FINDINGS

After the hearing and at the Probate Court's request, both parties submitted proposed findings of fact and conclusions of law. The Probate Court subsequently adopted Glendon Richard's proposed findings and conclusions verbatim. Dow argues on appeal that this often-condemned practice frustrates a primary purpose of M.R.Civ.P. 52(a), to encourage the trial judge's careful attention in ascertaining and articulating the facts, and calls for us to review the trial court's legal conclusions more critically than we otherwise would.

Although we do not approve of trial courts adopting verbatim the proposed findings of counsel,[4] we note that it does not constitute automatic error for a trial court to do so. *In re Sabrina M.*, 460 A.2d 1009, 1012 (Me.1983). We will, however, "closely scrutinize such findings to determine whether the trial court has adequately performed its judicial function." *Sabrina M.*, 460 A.2d at 1013. In this case we are satisfied that the Probate Court's findings, although not supported by the record in every detail, adequately indicate the underlying facts upon which the court's decision was based. *Id.*

The entry is:

Judgment affirmed.

All concurring.

---

**4.** Trial courts should "find the facts specially and state separately [their] conclusions of law" within the meaning of Rule 52(a). Although we find no fault with trial courts asking counsel for both sides to submit proposed findings of fact and conclusions of law, we emphasize that trial courts should proceed from this point independently to arrive at their own factual findings and legal conclusions.