2003 ME 73

**ESTATE OF HAROLD B. HORNE**

**No. YOR–02–636.**

Supreme Judicial Court of Maine.

Submitted on briefs: April 9, 2003.
Decided: May 21, 2003.

Richard B. Slosberg, Portland, Herschel Lerman, Biddeford, for appellant.

Durward W. Parkinson, Bergen & Parkinson, LLC, Kennebunk, for appellee.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Geraldine Horne appeals from a judgment entered in the York County Probate Court (*Nadeau, J.*) on petitions regarding different wills executed by Harold Horne, the decedent. The decedent's daughter, Geraldine, petitioned for approval of the 1975 will, and her brother, Richard Horne, petitioned for approval of the will executed by Harold in 1999. Geraldine contends that the 1999 will, which the court determined to be valid, was the product of undue influence by Richard, and that the 1975 will should govern the distribution of Harold's estate. Because a review of the evidence does not compel a different result, we defer to the determination of the Probate Court that the 1999 will was not the product of undue influence, and affirm the judgment.

I.

[¶ 2] Harold Horne, a resident of Acton, died on February 12, 2000, at the age of

93. He was predeceased by his wife, Concelia, in May of 1999, and was survived by their two children, Geraldine and Richard. On December 9, 1999, Harold signed a will, which appointed Richard as his personal representative. This will left everything to Richard, and specifically excluded Geraldine. Harold's previous will, signed in 1975, had divided his estate equally between Richard and Geraldine.

[¶ 3] The Probate Court held a hearing on Geraldine's challenge to the 1999 will. Geraldine testified that when her mother was in ill health in 1998, Geraldine helped her parents by cleaning their house, bringing them groceries, cooking for them, and taking them to various appointments. She also testified that she had a poor relationship with her brother, Richard, and that they have rarely spoken in twenty years. Near the end of her mother's life, her mother was in a nursing home, where Geraldine visited her often, but never saw Richard.

[¶ 4] In the winter of 1999, Harold fell and broke his ribs. After taking him to the hospital, Geraldine brought her father to her home, where he stayed with her for the rest of that winter. Her father asked Geraldine's companion, Rolf, to go to his farm and get a cigar box that he kept in his attic, which, at the time, contained $15,000 in cash. After counting the money, he put it back in the box and under his bed. During the months that Harold was staying with Geraldine, Richard never called, wrote, or stopped in to visit him. Harold returned to his own home on his farm in the spring of 1999.

[¶ 5] After her mother died, Geraldine continued to take care of Harold by cleaning his home, washing his clothes, cooking for him, and running his errands. She stayed overnight a couple times a week in a motor home on the farm near Harold's home. She would occasionally see Richard outside at the farm, but he never spoke to her or their father and did not go inside the home. Richard hauled logs off their father's property and used them in his business. Geraldine described her relationship with her father through July of 1999 as "excellent."

[¶ 6] In October, however, Harold began to threaten her when she went to his farm. He told her, "You get out of here or I'll shoot you" and "[Richard] said I could shoot you." Her father told her that he did not want her on his property anymore because she stole his money from the cigar box. She told him that she did not steal any of his money and helped him look for some money that he kept under the carpet, but it was not there. She reported the incident and threats to the Sheriff's Department and was advised to stay away from Harold for her own safety. She did not have any further contact with her father, who died in February of 2000. It was not until after his death that Geraldine learned that he had executed a new will, which excluded her from his estate.

[¶ 7] Rolf Fossum, Geraldine's companion, testified that after the alleged theft, when Rolf and Geraldine went to get some things out of their motor home next to Harold's residence, Harold did not stop them, but he did glare at them. Rolf was aware that Harold accused Geraldine of stealing his money, but Rolf blamed Richard for telling Harold that she stole it. Neither Geraldine nor Rolf contacted the Department of Human Services or the Bureau of Elder and Adult Services to have them investigate Harold's mental or physical health.

[¶ 8] Richard called a law office in Sanford to make the appointment for the drafting of Harold's will in December of 1999, and Richard was present throughout the initial meeting between Attorney Edward Titcomb and Harold. Titcomb testi-

fied that he was satisfied during his meetings with Harold that Harold's thinking was clear and that the will, which except for some tangible personal property, left his estate to Richard, was representative of his intent; that Harold was aware that he was giving the bulk of his estate to Richard; and, although Richard was present during the meetings, the attorney noticed nothing to indicate that Richard was influencing Harold. It was Titcomb's understanding that Harold wanted to exclude Geraldine because she stole $2000, his bankbooks, some other papers, and his mail. Titcomb sent a letter addressed to Richard regarding the proposed will for Harold and enclosed the draft will and a power of attorney. He also sent the bill for his services to Harold in care of Richard at Richard's address because there was concern that Harold's mail was being taken. Titcomb stated that it was his standard practice to ask third parties to leave the room if he believed that his client was being pressured in some way or failing to give clear information, but he did not get that impression when meeting with Harold in the presence of Richard.

[¶ 9] Sandra Gauthier, a paralegal at Titcomb's law firm, testified that, although she did not specifically remember Harold Horne, she did identify her own signature as a witness on the 1999 will. She testified that if she felt a person was not competent or was under some sort of influence then she would not have signed the will. Michelle Cronin, a legal assistant at the same firm, and also a witness, remembered that Attorney Titcomb had to speak very loudly to Harold, but Harold did not seem to be under anyone's influence and he appeared to understand the questions that Attorney Titcomb asked him. She testified that she would not have witnessed the will if she believed that the testator was not competent or was not acting of his own free will.

[¶ 10] Richard testified that his father was a farmer and an independent, strong-willed man. His father was physically strong until the last two months of his life, and he remained mentally alert until just a few days before he died. Richard was living with his father when he died.

[¶ 11] Richard testified that it was his habit when his parents were living to stop by every day after work to help them haul water or split wood. If Geraldine was there he would either stay outside until she left or come back later. Richard admitted that he cut and hauled logs off of his parents' property and kept machinery on their property, which he used to make lumber for his business. Richard also used his parents' property as a place to store old stoves, refrigerators, and cars.

[¶ 12] Richard testified that Harold disinherited Geraldine because "she cleaned him out." One afternoon, Geraldine's companion, Rolf, took Harold to Portland to get a hearing aid. Geraldine stayed behind. When Harold returned home, he discovered that certain property was missing. Richard testified that Geraldine must have been in their father's home that day and taken the valuables because she was the only one to have a key and no doors or windows were broken. When Richard went to Harold's home after work that day, his father was upset. Harold told him that Geraldine cleaned him out and took the $2000 from under the carpet. Harold said it must have been Geraldine because she had told him she was sick and could not go with him to Portland. According to Richard, his father's bankbooks were also missing, prompting Harold to ask Richard to take him to Sanford to make Richard a joint owner of his bank accounts.

[¶ 13] Richard was aware that his father's previous will provided for Richard and Geraldine to share their father's estate

equally, and that the 1999 will excluded Geraldine. Harold told Richard that he wanted to disinherit Geraldine; Richard testified that he did not tell his father to disinherit Geraldine. Richard called Titcomb's office and made the appointment because his father did not have a phone, and he drove his father to the appointment because his father no longer drove. Richard said he did not have any significant input during the meeting, and that the attorney spoke with Harold. Richard brought Harold back to Titcomb's office a second time for the signing of the will. His father died approximately two months later.

[¶ 14] Anita Horne, Richard's wife, testified that Richard lived with his father for the last six or eight weeks of his father's life, and she visited with them daily. She testified that she was able to converse with Harold until the last few days of his life when he slept most of the time. Harold had been getting visibly weaker in the last six to eight weeks that Richard lived with him, but he refused to go to the hospital or to see a doctor.

## II.

[¶ 15] Geraldine appeals the Probate Court's conclusion that the 1999 will was valid. The court found that a confidential relationship existed between Richard and his father, which would allow an inference of undue influence. Relying on the evidence of Harold's capacity at the time the will was executed, however, the court was "unable to conclude that the decedent was a victim of undue influence or that he lacked testamentary capacity when he executed his 1999 will."

## III.

[¶ 16] Geraldine contends that the evidence clearly and convincingly establishes that Richard unduly influenced their father to make the 1999 will. Geraldine argues that the court believed that there was undue influence, but felt prohibited from finding in her favor because of the clear and convincing standard of proof, which she contends, the court improperly applied. Geraldine asserts that the court erred by applying a standard almost as demanding as proof beyond a reasonable doubt.

[¶ 17] When an order of the Probate Court is appealed, we defer to the Probate Court on factual findings unless they are clearly erroneous, but we review *de novo* the application of the law to the facts. *Westleigh v. Conger,* 2000 ME 134, ¶ 7, 755 A.2d 518, 519–20. If the evidence regarding undue influence would support a finding either way, we will not substitute our judgment for that of the trial court. *Estate of Record,* 534 A.2d 1319, 1323 (Me. 1987).

[¶ 18] The Probate Code provides that the "[p]roponents of a will have the burden of establishing prima facie proof of due execution" and "[c]ontestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake or revocation." 18–A M.R.S.A. § 3–407 (1998). The evidence established prima facie proof of due execution. The issue before the Probate Court was whether Geraldine proved that Harold's 1999 will was the product of undue influence. We have previously defined undue influence as follows:

[I]nfluence in connection with the execution of the will, and *operating at the time the will is made,* amounting to moral coercions, destroying free agency, or opportunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it.

*Estate of Bridges,* 565 A.2d 316, 317 (Me. 1989) (quoting *Rogers, Appellant,* 123 Me. 459, 461, 123 A. 634, 636 (1924)). As the contestant, Geraldine's burden is to establish undue influence by clear and convincing evidence.[1] *See Estate of Lewis,* 2001 ME 74, ¶ 7, 770 A.2d 619, 622.

▉ [¶ 19] "An inference of undue influence is permitted where a confidential relationship exists between the testator and the one who is asserted to have influenced [the testator] and all of the testator's property is unexpectedly transferred in a will to only one of several equally related persons." *Estate of Langley,* 586 A.2d 1270, 1271–72 (Me.1991). Such an inference, although permitted, "does not raise a presumption of undue influence and more is required to establish that undue influence has occurred." *Id.* at 1272.

[¶ 20] In *Langley,* the testator had executed a will in 1979 that divided her estate equally between her two children. *Id.* at 1271. She executed a new will in 1983 that left her daughter only $100 and the rest of her estate, including her real estate, went to her son. *Id.* The daughter urged us to vacate the decision of the Probate Court and to conclude that she had established undue influence by clear and convincing evidence through her testimony that her brother "intentionally used a series of family disputes to drive a wedge between [herself] and [her mother] and cause [her mother] to blame [her] for the family's problems." *Id.* at 1272. We affirmed the Probate Court's finding, concluding that a "review of the record reveals no evidence that would compel a different conclusion." *Id; see also Bridges,* 565 A.2d at 317 (holding that contestant did not meet his bur-

den of proving undue influence even though beneficiaries drove testator to her attorney's office to make a will and were present for part of the meeting with her attorney).

[¶ 21] In this case, the court found that a confidential relationship existed between Richard and Harold and that there was an unlikely transfer of assets to Richard, which allowed the court to draw an inference of undue influence. Geraldine and Rolf presented evidence that showed Geraldine to be a responsible and caring individual, who did much for her aging parents, and who had an excellent relationship with her father. There was evidence that Richard showed little concern for his parents' ailing health, particularly when his mother was dying and when his father broke several ribs. Geraldine's excellent relationship with her father deteriorated, however, when he blamed her for the alleged theft of his property.

▉ [¶ 22] Although evidence in the record would support a finding that Harold's 1999 will was the product of undue influence, because as the contestant of that will, Geraldine had the burden of proving that the will was the product of undue influence, we must affirm the Probate Court's decision unless the evidence *compels* a different finding. *See Langley,* 586 A.2d at 1272; *see also Grant's Farm Assocs., Inc. v. Town of Kittery,* 554 A.2d 799, 801 (Me.1989) (finding that in order for party with burden of proof at trial to prevail on appeal, the appellant must show not only that the court's findings were unsupported by the evidence, "but also

---

**1.** In order to meet the clear and convincing evidence standard of proof, the party bearing the burden of persuasion may prevail only if she can "place in the ultimate factfinder an abiding conviction that the truth of [her] factual contentions are 'highly probable.' " *Tay-*

*lor v. Comm'r of Mental Health & Mental Retardation,* 481 A.2d 139, 153 (Me.1984) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

 

that the record compels contrary findings"). There was sufficient evidence in the record that allowed the Probate Court to be unpersuaded that Geraldine met her burden of showing undue influence by clear and convincing evidence. Richard testified that his father concluded for himself that Geraldine had taken his money on the day she stayed behind claiming to be sick. Richard also testified that it was his father's idea to change the bank accounts to joint accounts, and that his father wanted to make a new will that disinherited Geraldine. Attorney Titcomb testified that Harold wanted to make a will disinheriting Geraldine and that he knew his assets and appeared to be clear minded. While Richard was present during both meetings, Titcomb did not notice any indications that Richard was influencing Harold. Both witnesses to the execution of the will also testified that they would not have signed the will if they believed there was any undue influence or lack of mental capacity. The court focused on the evidence about the execution of the will at Attorney Titcomb's office, and we have said that whether or not a testator was under undue influence is measured at the time the will is executed. *See Estate of Bridges*, 565 A.2d at 317. Moreover, both Richard and Anita testified that Harold remained clear minded until the last three days of his life. The court also found that the primary purpose of Richard residing with his father during the last few weeks of his life was to provide his father with care and comfort.

[¶ 23] The parties presented conflicting evidence as to whether Harold was unduly influenced in the making and the execution of the December 1999 will. The evidence supports an inference of undue influence, and had the Probate Court concluded that the will was the product of undue influence, it is unlikely that we would disturb such a conclusion. That evidence, however, does not *compel* such a conclusion. *See Langley*, 586 A.2d at 1272. We are not convinced that the court misunderstood or misapplied the clear and convincing standard, *see id.*, and we will not substitute our own judgment for that of the trial court. *See Record*, 534 A.2d at 1323.

The entry is:

Judgment affirmed.