MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2014 ME 75
Docket:       And-13-440
Argued:       April 8, 2014
Decided:      June 10, 2014

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

## ESTATE OF RUTH E. O'BRIEN-HAMEL

SILVER, J.

[¶1]   Jennifer Edmondson appeals from an order of the Androscoggin County Probate Court (*Dubois, J.*) denying her petition for a formal adjudication of intestacy and for appointment as personal representative of the estate of her mother, Ruth E. O'Brien-Hamel.  Jennifer contends that the Probate Court abused its discretion in permitting Donald F. Hamel Sr., Ruth's current personal representative, to present the testimony of Ruth's hospice-care physician despite failing to timely or properly designate the physician as an expert.  Jennifer further contends that the Probate Court erred in finding that Ruth had the requisite capacity to make a will.  We affirm the judgment.

## I.  BACKGROUND

[¶2]   The following facts, which are supported by competent evidence in the record, are drawn from the Probate Court's factual findings and are viewed in the light most favorable to the court's judgment.  *See Estate of Greenblatt*, 2014 ME 32, ¶ 2, 86 A.3d 1215.

2

[¶3]   Ruth E. O'Brien-Hamel died on October 27, 2012, at the age of fifty-five.   Ruth is survived by her three children, Jennifer Edmondson, Sean O'Brien, and Erin O'Brien.   She is also survived by Donald F. Hamel, whom Ruth married the day before her death[1] and to whom she left all of her property by a will executed the same day.

[¶4]   Ruth and Donald met in November 2005, and soon thereafter began living together at Ruth's home in Auburn.   In addition to the residence where she and Donald lived, Ruth partially owned a farm that had been in her family for many years.

[¶5]   Ruth was estranged from her children in the final years of her life.   With the exception of an unsuccessful attempt to reconnect at a family funeral in February 2011, Ruth had not seen Jennifer since Christmas 2005 or 2006.   Although Jennifer and Ruth spoke over the phone one or two years before Ruth's death, that conversation caused Ruth to become sad, and when Donald intervened Jennifer said, "[Y]ou deal with it," and hung up.   In 2011, while Erin was residing with Ruth and Donald, she got into an argument with Ruth.   After giving Ruth an "ultimatum" requiring Ruth to choose between her and Donald, Erin moved out and did not return.   Ruth had no contact with Sean or his children after 2011.

---

[1]   The Probate Court made no findings regarding the marriage ceremony itself, and concluded that it lacked subject matter jurisdiction as to the validity of the marriage.   The parties do not dispute that a marriage ceremony was performed at the hospice on October 26, 2012, and the validity of the marriage is not at issue in this appeal.

[¶6]  Ruth was admitted to Central Maine Medical Center (CMMC) on October 4, 2012.  Ruth was initially diagnosed with pneumonia, but it was later determined that she had untreatable, stage-four lung cancer.  During her stay at CMMC, Ruth had difficulty breathing, grimaced in pain after procedures were performed to remove fluid from her body, and was prescribed morphine, which caused her to go into a deep sleep.

[¶7]  Ruth's brother, David Hunnewell, visited Ruth twice daily and kept Ruth's children apprised of her condition.  Ruth spent part of her hospitalization in the intensive care unit.  While Ruth was in the ICU, she was heavily medicated, was not lucid, and had a tube in her throat.  Ruth became more lucid and communicative after she was transferred out of the ICU; at that time, she told David that she wanted to make a will and wanted Donald to have her home, but said that she did not want to bother Donald with the farm property.  David testified, however, that Ruth said that she wanted her home to pass to her children and Donald's children from another relationship after Donald's death.

[¶8]  On October 19, 2012, Ruth was discharged from the hospital, but was readmitted to CMMC the next day and remained there until October 25, 2012.  Medical records from Ruth's second hospitalization indicate that Ruth had difficulty communicating, and although she was mostly lucid, had periods of delirium and hallucinations.

4

[¶9]  On October 25, 2012, Ruth was discharged from CMMC and taken by ambulance to Androscoggin Home Care and Hospice.  Hospice records indicate that, upon admission, Ruth was lethargic, minimally responsive, and unable to speak.  The records also indicate that Ruth expressed her desire to marry Donald before she died, but the records do not explain how Ruth communicated that information to the staff.  A nurse noted in the medical records that Donald "need[ed] to marry [Ruth] so he does not lose the home to her children."  Ruth was administered morphine during her stay at the hospice and suffered periods of delirium.[2]

[¶10]  On October 26, 2012, Jaime Eller, a social worker and notary employed by the hospice, met with Ruth after being told by an intern that Ruth wanted to prepare a will.  Eller prepared a will that Ruth signed the same day with the assistance of another person in a "hand-over-hand" fashion.  The will provided: "I, Ruth O'Brien, leave all remaining aspects of my estate, including any personal property, insurance matters, and financial holdings to Donald F. Hamel Sr. to dispose of as he sees fit."[3]

---

[2]  Ruth was also administered Haloperidol, an antipsychotic medication used to treat nausea and delirium.

[3]  The Probate Court made no specific findings as to the contents of the will, but the parties do not contest that the will purports to leave Ruth's entire estate to Donald.

[¶11]   Eller testified that Ruth indicated that she wanted Donald to have everything and for him be the personal representative of her estate, but Eller could not recall how Ruth communicated this information, whether Ruth's eyes were open, or whether she had a conversation with Ruth about the will or its effect on her children.   Eller's notes indicate that Ruth was "lethargic, but of sound mind and able to complete [a] simple will and sign it," and that Ruth said "I want Don to have everything."   Eller testified that Ruth did not sign the first document presented to her, but did not testify to the substance of any adjustment made to the document before Ruth signed it.   Lucienne Hamel, Donald's mother and the only attesting witness who appeared at the hearing, testified that Ruth did not speak or open her eyes during the execution of the will, but nodded her head in the affirmative when Eller read her the will.

[¶12]   On October 26, 2012, the same day that the will was executed, Ruth and Donald were married.   Ruth died the following day.

[¶13]   None of Ruth's children visited her during her hospitalizations in October 2012.   Erin gave birth at CMMC during the period that Ruth was hospitalized there, but did not visit Ruth or arrange for Ruth to visit with her newborn grandchild.   Ruth had been unaware of the pregnancy until that time. Ruth's children did visit her at the hospice on October 26, 2012, the day before she died.

[¶14]  On November 26, 2012, Donald filed an application for informal probate of the will and for his appointment as personal representative.  The following day, Donald was appointed personal representative and the will was informally admitted to probate.  On December 3, 2012, Jennifer filed a petition for a formal adjudication of intestacy and for her appointment as personal representative.  In her petition, Jennifer alleged that Ruth lacked the capacity to execute the will.

[¶15]  The Probate Court entered a scheduling order requiring that the parties designate expert witnesses no later than April 22, 2013.  On May 7, 2013, Donald designated Dr. Roger Austin, Ruth's hospice physician, as an expert on the issue of testamentary capacity.  Jennifer filed a motion in limine to exclude Dr. Austin's testimony on the grounds that the expert designation was untimely and inadequate pursuant to Maine Rule of Civil Procedure 26(b)(4)(A)(i), which is applicable to formal probate proceedings through Maine Rule of Probate Procedure 26.  Donald subsequently moved to enlarge the time to designate an expert.

[¶16]  The court held an evidentiary hearing on Jennifer's petition on May 29, 2013.  At the beginning of the hearing, the court reserved its ruling on Jennifer's motion to exclude Dr. Austin's testimony, indicating that it was not inclined to grant the motion because "the Court doesn't believe that [Jennifer] would be surprised to the extent there is any prejudice."  The court indicated,

however, that Jennifer could renew her motion at the appropriate time if "the testimony unfolds, and it turns out that there is some surprise."

[¶17] Dr. Austin testified that he did not conduct an evaluation of Ruth's capacity. He had done so for hospice patients in the past when Eller asked him to do so, but he had no recollection of receiving such a request in this case. Dr. Austin testified that he was therefore unable to render an opinion as to Ruth's capacity at the time she executed the will, and indicated that it would be very difficult to assess a patient's capacity based only on medical records without direct observation of the patient.

[¶18] Dr. Austin acknowledged that certain aspects of the medical records raised concerns as to Ruth's capacity. He conceded that Ruth experienced some delirium while at the hospice, but testified that delirium would not necessarily render a person incapable of knowing what his or her assets are. He testified that morphine can affect cognitive abilities, but that it does not do so for most patients, and that the dosages administered to Ruth were low. Dr. Austin also acknowledged that Ruth's sodium level was low upon her discharge from CMMC, that her oxygen level was low at certain points on October 26, 2012, and that these levels could have had an impact on her capacity.

[¶19] Jennifer presented testimony from Dr. Kevin Kendall, who opined that the synergistic effects of Ruth's sodium level, blood pressure, oxygen level,

8

medications, pain, and imminence of death resulted in Ruth being incapable of normal judgment and reasoning during her stay at the hospice. In forming his opinion, Dr. Kendall reviewed the CMMC and hospice records, along with depositions taken in the case. He did not personally observe Ruth or speak to any hospice personnel. Dr. Kendall acknowledged that he could not determine, based on the medical records, Ruth's sodium level, oxygen level, blood pressure, orientation to time and place, or pharmacological side effects at the time of the execution of the will.

[¶20]  On September 4, 2013, the Probate Court entered an order denying Jennifer's petition for an adjudication of intestacy and admitting the will to probate. The court also denied Jennifer's motion in limine to exclude Dr. Austin's testimony because (1) Dr. Austin did not offer an opinion on the issue of capacity, (2) Jennifer did not renew her objection as the court had instructed her to do, and (3) there was no surprise or prejudice to Jennifer because she had access to Dr. Austin's records well in advance of the hearing.

[¶21]  The court concluded that Donald had sustained his burden of showing due execution of the will, thereby raising a presumption of testamentary capacity. The court further concluded that Jennifer had failed to prove the absence of testamentary capacity by a preponderance of the evidence. The court found that, while at CMMC, Ruth "was lucid, was interacting with the healthcare providers,

understood her situation, was aware of the need to execute a will, [and] discussed with her brother some specifics regarding her assets and possible plans of distribution." The court further determined that although Ruth's "ability to verbalize was significantly impaired and she was in a much weakened state" after her discharge from CMMC, there was evidence that Ruth interacted with hospice personnel and "there was no persuasive evidence that [Ruth] was unable to rationally think and make sound reasoned decisions while she was in hospice care." The court also noted the absence of evidence as to Ruth's sodium level, oxygen level, blood pressure, orientation to time and place, or pharmacological side effects at the time of the execution of the will. Jennifer timely appealed.

## II. DISCUSSION

### A. Expert Testimony

[¶22] Jennifer contends that the Probate Court abused its discretion in denying her motion in limine to exclude Dr. Austin's testimony based on Donald's failure to timely and adequately designate Dr. Austin as an expert. Specifically, Jennifer contends that the Probate Court should have required that Donald show excusable neglect, pursuant to Maine Rule of Civil Procedure 6(b), which is applicable to probate proceedings through Maine Rule of Probate Procedure 6. Jennifer argues that Donald's untimely and inadequate designation caused her surprise and prejudice. We review the Probate Court's admission of expert

testimony for an abuse of discretion. *See Bray v. Grindle*, 2002 ME 130, ¶¶ 9-10, 802 A.2d 1004; *Chrysler Credit Corp. v. Bert Cote's L/A Auto Sales, Inc.*, 1998 ME 53, ¶¶ 19, 23, 707 A.2d 1311.

[¶23] Maine Rule of Civil Procedure 6(b) provides that the court may grant an enlargement of time after the expiration of the applicable time period if "the failure to act was the result of excusable neglect." *See also Johnson v. Carleton*, 2001 ME 12, ¶¶ 7-10, 765 A.2d 571 (upholding the trial court's denial of a motion for enlargement of time to designate expert witnesses where the moving party failed to show excusable neglect pursuant to Rule 6(b)). Under circumstances similar to this case, however, we have held that a court did not abuse its discretion in permitting an undesignated expert to testify, absent a showing of excusable neglect, because the opposing party was not "unfairly surprised" by the expert's testimony. *See Bray*, 2002 ME 130, ¶ 9, 802 A.2d 1004 (concluding that the trial court did not abuse its discretion in permitting an expert to testify because, despite the proponent's failure to formally designate the expert, the opposing party "knew long before trial" that the expert had been retained, and was not "unfairly surprised").

[¶24] Here, the court did not abuse its discretion in determining that there was no unfair surprise to Jennifer because Dr. Austin was designated on May 7, 2013, approximately three weeks before the hearing. Jennifer also had

access to the hospice records containing Dr. Austin's notes well in advance of the hearing; her own expert reviewed them in forming his opinion as to Ruth's capacity. Even if the court had abused its discretion in denying Jennifer's motion in limine, any error was harmless because Dr. Austin did not offer any opinion regarding Ruth's testamentary capacity, and the court based its findings on this issue on other evidence.[4] *See* M.R. Civ. P. 61; M.R. Prob. P. 61; *Tolliver v. Dep't of Transp.*, 2008 ME 83, ¶ 39, 948 A.2d 1223; *DiPietro v. Boynton*, 628 A.2d 1019, 1024 (Me. 1993).

B.     Testamentary Capacity

[¶25]   Jennifer next argues that the Probate Court erred in concluding that Ruth had the capacity to execute a will. Specifically, Jennifer contends that the court failed to properly weigh "[a]ll of the medical evidence, the inability of . . . Eller to give an explanation of how the contents of the will were given to her, the inconsistency between Ruth's stated intentions and the will prepared by Ms. Eller, [and] the collective inability of the witnesses to recall essential details."

---

[4]   Jennifer suggests that she was unfairly surprised and prejudiced by Dr. Austin's testimony that he was unable to form an opinion as to Ruth's capacity because Dr. Austin's designation indicated that he would offer such an opinion, and because Dr. Austin's testimony "undermined the significance of the forensic analysis" of Dr. Kendall. Jennifer, however, failed to renew her objection to Dr. Austin's testimony, despite the trial court's invitation to do so, when it became clear that Dr. Austin would not offer an opinion as to capacity or when he testified that it would be difficult to assess capacity from medical records alone. *See, e.g.*, *State v. Oeur*, 1998 ME 82, ¶ 4, 711 A.2d 118 (reviewing the admission of evidence for obvious error when the defendant moved in limine to exclude the evidence but failed to renew his objection at trial).

[¶26] "Proponents of a will have the burden of establishing prima facie proof of due execution in all cases, and, if they are also petitioners, prima facie proof of death and venue.[5] Contestants of a will have the burden of establishing lack of testamentary intent or capacity . . . ." 18-A M.R.S. § 3-407 (2013); *see also Estate of Horne*, 2003 ME 73, ¶ 18, 822 A.2d 1177; *Estate of Siebert*, 1999 ME 156, ¶ 4, 739 A.2d 365. Testamentary capacity is an issue of fact that we review for clear error. *Estate of Siebert*, 1999 ME 156, ¶ 6, 739 A.2d 365; *see also Estate of Greenblatt*, 2014 ME 32, ¶ 12, 86 A.3d 1215 ("[W]e defer to the Probate Court on factual findings unless they are clearly erroneous, but . . . review *de novo* the application of the law to the facts." (quoting *Estate of Horne*, 2003 ME 73, ¶ 17, 822 A.2d 1177)).

[¶27] Because a party contesting the validity of a will bears the burden of proving the absence of testamentary capacity, we will not disturb the Probate Court's findings unless the evidence compels a different result. *Estate of Siebert*, 1999 ME 156, ¶ 6, 739 A.2d 365; *see also Estate of Dodge*, 576 A.2d 755, 757 (Me. 1990) (upholding the Probate Court's finding of capacity despite evidence that the testatrix showed signs of "fatigue, confusion and difficulty in communicating" because there was "considerable evidence . . . that she possessed

---

[5] Jennifer does not contest the Probate Court's determination that Donald presented prima facie evidence of due execution of the will. The parties stipulated in the Probate Court to proof of death and venue.

at least [a] modest degree of competence"); *Estate of Rosen*, 447 A.2d 1220, 1223 (Me. 1982) ("Where . . . there is a choice between two permissible views of the weight of the evidence, the findings of the Probate Court must stand."). The credibility and weight to be assigned to the evidence are within the sole province of the Probate Court as the fact-finder. *Estate of Siebert*, 1999 ME 156, ¶ 10, 739 A.2d 365. Acting as the fact-finder, the court may selectively accept and reject testimony. *See, e.g.*, *State v. Williams*, 2012 ME 63, ¶ 49, 52 A.3d 911; *Efstathiou v. Efstathiou*, 2009 ME 107, ¶ 12, 982 A.2d 339.

[¶28] We have described testamentary capacity as follows:

A disposing mind involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds; and a disposing memory exists when one can recall the general nature, condition and extent of his property, and his relations to those to whom he gives, and also to those from whom he excludes, his bounty. He must have active memory enough to bring to his mind the nature and particulars of the business to be transacted, and mental power enough to appreciate them, and act with sense and judgment in regard to them. He must have sufficient capacity to comprehend the condition of his property, his relations to the persons who were or should have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.

*Estate of Siebert*, 1999 ME 156, ¶ 5, 739 A.2d 365 (quotation marks omitted); *see also Estate of Record*, 534 A.2d 1319, 1321 (Me. 1987) (discussing testamentary capacity). This standard requires only a modest level of competence and a general knowledge of one's assets. *Estate of Dodge*, 576 A.2d at 757; *Estate of Rosen*, 447 A.2d at 1222-23. "[E]vidence of the testator's behavior during a reasonable period before and after the execution of the will is admissible to show his capacity." *Estate of Record*, 534 A.2d at 1321.

[¶29] Contrary to Jennifer's arguments on appeal, the court did not clearly err in finding that Ruth had the requisite testamentary capacity to execute a will. The record supports the court's finding that, while at CMMC, Ruth was mostly lucid, was able to interact with others, and discussed executing a will. There was also competent evidence to support the court's finding that although Ruth's ability to verbally communicate was significantly impaired by the time she was admitted to hospice, Ruth was nevertheless able to interact with hospice personnel. Although the court found that Ruth was experiencing some delirium, and there was evidence that factors such as her medications and low sodium and oxygen levels could have impacted her capacity, the court simply was not persuaded that Ruth lacked the modest level of competency necessary to execute a will. *See Estate of Dodge*, 576 A.2d at 757; *Estate of Rosen*, 447 A.2d at 1222-23. Because the

evidence does not compel a contrary conclusion, we will not disturb the Probate Court's findings. *See Estate of Siebert*, 1999 ME 156, ¶ 6, 739 A.2d 365.

The entry is:

Judgment affirmed.

---

**On the briefs and at oral argument:**

William H. Childs, Esq., Childs, Rundlett, Fifield & Altshuler, LLC, Portland, for appellant Jennifer Edmondson

Jason Dionne, Esq., Isaacson & Raymond, P.A., Lewiston, for appellee Donald Hamel

Androscoggin County Probate Court docket number 2012-474
FOR CLERK REFERENCE ONLY